THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* LARRY BRAGG, Defendant-Appellant.

First District (5th Division)    No. 78-586

Opinion filed January 26, 1979.

---

* Justice Buckley participated in this decision while assigned to the Illinois Appellate Court, First District.

Ralph Ruebner and Daniel Cummings, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and Iris E. Sholder, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

Defendant was charged with armed robbery and unlawful restraint. (Ill. Rev. Stat. 1973, ch. 38, pars. 18—2, 10—3.) A jury found him guilty of both charges and the trial judge sentenced him to 5 to 10 years for armed robbery, and 1 to 3 years for unlawful restraint, the sentences to run concurrently. On appeal, defendant contends that (1) he was deprived of his right of cross-examination due to the court's failure to appoint an interpreter and (2) he was denied a fair trial since the prosecutor repeatedly stated his personal belief in defendant's guilt. We affirm.

STATE'S CASE

Rosemary Young testified that she was born in China, came to the United States in 1948 and is now a citizen of this country. On September 25, 1975, at approximately 2:30 p.m., she was sitting in a car owned by her cousin, parked in front of 230 South LaSalle. Her cousin had driven, and left her sitting in the car with the keys, on the west side of the street. She noticed that a police officer, whom she recognized as Officer Fiore, was standing on the east side of the street. A black man, carrying a gun, entered the car on the driver's side and sat behind the wheel. She asked him what he was trying to do. She attempted to get out, but another man, whom she identified as defendant, entered from the passenger's side, pushed her into the middle of the seat, and closed the door. The man behind the wheel passed the gun over her, and into the hands of defendant. Defendant pointed the gun into her lower right side and told her not to scream, because if she did, he would kill her. She could not scream because she was "too scared."

The driver started the car and proceeded south, passed where Officer Fiore was standing, and turned left on Jackson. He continued to Clark Street, turned right, and proceeded to Van Buren Street. He again turned right, whereupon one officer jumped on the hood and four or five policemen stopped the car. Between the time the car first pulled away, until the police apprehension, Young told defendant to stop and let her out of the car. He told her to keep quiet if she did not want to get killed.

When the police stopped the vehicle, defendant threw the gun on the floor on the passenger's side. Defendant and the other man exited and she remained in the car, shaking. Officer McCarthy asked her to come out but she could not move. She told him that there was a gun on the floor and she pointed to it.

Although Young often stated that she did not understand certain questions, and needed them repeated or rephrased, the substance of her testimony during cross-examination was as follows:

It was one block or less after the car pulled away from 230 South LaSalle that she asked them to stop the car. She first saw the man who

eventually drove the car, and he approached from the north side of the vehicle. He never said anything. Neither man took anything from her or asked her to give him anything. She did not tell Officer McCarthy that the person seated on the passenger side had a gun but she gave this information to Officer Fiore, whom she talked to on Van Buren. She could not answer at trial that the person who entered on the passenger side had a gun.

When she tried to get out of the car, she did not see a gun in defendant's hand, and she did not tell the police that she saw a gun in his hand at that time. The driver entered the car with a gun and pointed it at her. As soon as defendant "pulled her over," the other man handed the gun over to defendant. She was told to "shut up" about three times, presumably by defendant, since the driver said nothing. It was not the driver that said "don't scream," and she did not tell the police that the driver said that. During the time when the car was in motion, she was looking straight ahead, but had turned toward the passenger side when defendant first came in. When she saw Fiore, he was standing, facing the street, and talking to someone.

During the course of Young's cross-examination a sidebar was held during which defense counsel requested the appointment of a translator, which was denied. At the conclusion of Young's testimony, defense counsel made a motion for a mistrial, based on the failure to appoint a translator resulting in the frustration of her attempts to effectively cross-examine the witness. The trial judge stated:

> "I'm going to deny the Defendant's motion for a mistrial and indicate that I find that the witness has not in the Court's opinion has not sought to evade or avoid any question. As we previously indicated the witness does have some difficulty with the English Language although she speaks clearly and can understand simply [sic] questions, but I believe that the difficulty that the witness had was in the form of the question put to her as opposed to seeking to evade or avoide [sic] any answers. On that basis I feel that there was adequate opportunity for cross examination and she could be recalled if you wish for further examination. Should the matter be relevant I'm concerned that some of these matters are in the form of collateral impeachment which is not admissible. You have had ample opportunity to test her recollection and have developed some minor discrepency [sic] between what she testified today on [sic] may or may not have said at a previous time and on that basis I'll deny the motion for a mistrial."

The State then called Officer Fiore who testified that on September 25, 1975, he was assigned to three-wheel traffic duty in the area bounded by Harrison to Adams and Wacker Drive to Michigan Avenue. At 2 p.m.

he was standing in front of the Continental Bank at 231 South LaSalle when he observed two black men cross the street and head towards a 1975 Lincoln Continental. He estimated that he was standing 30 feet away and his view was unobstructed. There was a woman, later identified as Rosemary Young, seated in the car on the passenger's side. He had seen the vehicle before and knew it to be owned by Mory Shu because he had issued him parking tickets in the past.

The taller of the two men, now known to him as Ronald Ruff, held a gun in his hand and walked to the driver's side of the car and entered. The shorter man, whom he identified as defendant, entered the passenger's side and he did not see anything in his hand. Young looked startled and made an attempt to get out, but defendant pushed her in. Fiore observed Ruff lean over and hand the gun to defendant.

Ruff started up the motor, pulled away, and headed south down LaSalle Street. Fiore got on his three-wheeled vehicle and pursued them. The car turned left on Jackson and proceeded east. Fiore gave a "flash message" on his radio regarding an armed robbery and abduction and gave a description of the car. He continued following the car down Jackson and at Clark Street the vehicle turned right and proceeded south. He stated that the car switched from the right to the left lanes and continued hurriedly to Van Buren Street. Ruff then attempted to make a right turn from the left lane, across the traffic waiting at a red light. Three officers in a squad car, including Officer McCarthy, attempted to stop the vehicle. They managed to stop the car at approximately 105 West Van Buren.

Fiore testified that he never lost sight of the vehicle from the moment it left 230 South LaSalle. Shortly before the vehicle halted, Officer McCarthy was pointing a gun at the driver and ordering him to stop. After the car stopped, Fiore subdued defendant and frisked him. He did not find a weapon on him, but McCarthy searched the vehicle and found a revolver. He identified the gun in court as looking like the same gun he saw Ruff give defendant.

During cross-examination, Fiore stated that he observed the gun in Ruff's hand as the latter walked from the east to the west side of LaSalle Street, accompanied by defendant. Ruff was approximately 30 to 35 feet away. Fiore did not participate in the writing of the arrest report, nor did he make notes. He did not recall telling Investigator Regan that he observed a surprised and frightened expression on the victim's face when the two offenders entered the vehicle. While he was in front of the bank he was talking to another person but was looking in the direction of the vehicle. In the "flash report" he said that there were two armed black males and a female hostage and also mentioned the direction of flight. He continued to repeat the same message.

Officer John McCarthy testified that on September 25, 1975, he was assigned to the Loop foot patrol covering the area of Clark and Van Buren Streets. At 2 p.m. he was on the southwest corner when he received a radio call from Officer Fiore, informing him that there was an abduction and armed robbery in progress and that Fiore was chasing a 1975 Lincoln Continental, travelling eastbound, containing two black males, one of whom had a gun, and a female occupant. When McCarthy first observed Officer Fiore, he was travelling southbound on Clark Street on his three-wheel motorcycle. McCarthy was then on the southeast corner of Clark and Van Buren. Fiore was pointing his drawn revolver at the vehicle. There were two black males and an Oriental female in the car. When he first observed the Lincoln Continental, it was in the extreme right traffic lane. It then veered to the extreme left lane. The vehicle stopped at Van Buren and made a right turn across the two lanes of traffic that were stopped at a red light.

Officer McCarthy testified that he drew his revolver and ordered the vehicle to halt, but it proceeded westbound on Van Buren. He then positioned himself on the hood of the car and pointed his gun at the head of the driver, ordered him to halt, and he complied. McCarthy removed the driver, whom he later learned was Ronald Ruff, searched and handcuffed him. He did not find anything on his person. Defendant exited from the passenger's side and ran into the arms of Officer Fiore. Officer McCarthy searched the vehicle and found a handgun, which the female occupant was pointing to. The gun was loaded with a bullet that was cut in half and chambered to the immediate left of the top of the cylinder.

During cross-examination, McCarthy testified that he did not receive more than one message from Officer Fiore. At the preliminary hearing, he had testified that the nature of the call was that Fiore was chasing a vehicle that was wanted for the investigation of an abduction. McCarthy further stated at trial that Young did not tell him that the person who entered on the passenger's side of the vehicle had a gun. When McCarthy was positioned on the hood of the vehicle, he did not see a gun, nor did he see a gun when he was running alongside the vehicle in an effort to stop it. He did not know how or when the gun landed on the floor of the automobile.

Upon redirect, McCarthy testified that the police report is incorrect as to who had the gun when they first entered the vehicle. At the preliminary hearing he testified that Young said that the man entering on the driver's side had the weapon.

DEFENDANT'S CASE

Investigator Bryor Regan was called as the first witness for the defense. He testified that Officer Fiore did not tell him anything about

having observed a gun in the hands of defendant or the other man prior to their entering the car.

Rita Bragg (Rita), defendant's sister, testified that on September 25, 1975, defendant and their cousin Johnny Patrick lived with her and her four children. She saw defendant at 9:30 a.m. before she left home and when she returned, he was not there. She had never seen defendant smoke marijuana nor had she seen him carry a gun. She did not know Ronald Ruff, but had seen him before.

Johnny Patrick, defendant's cousin, testified that at about 9 a.m., Ronald Ruff knocked at the door and he let him in. Patrick and Ruff went upstairs to the bedroom where defendant was, and proceeded to roll some marijuana cigarettes. They also opened a bottle of wine. Patrick and Ruff smoked the marijuana but defendant would not join them. They called him names until he did smoke with them. They continued smoking marijuana, and drinking "vodka." After they finished the "wine," Ronald said "let's get more wine" and the witness stated he would not go, so defendant volunteered to go. Patrick further testified that he had known defendant at that time for 17 years and had never seen him drink wine or any intoxicant, nor smoke marijuana. When defendant left he was staggering and in Patrick's opinion, intoxicated.

During cross-examination, Patrick stated that Rita was gone by the time Ruff came over. They went upstairs to the bedroom because he did not want her to smell anything when she came home. During the next series of questions, Patrick kept switching his answer from "wine" to "vodka" to "whiskey," as the alcoholic beverage that Ruff brought over. He further stated that they rolled nine marijuana cigarettes. Patrick and Ruff talked defendant into smoking. The witness himself was high, but was alert enough to know what defendant was doing.

During redirect, Patrick stated that he had been high on marijuana before and knew how people reacted. He did not have experience buying different kinds of wines and liquors because he was not old enough to buy alcohol. During re-cross, he stated that he had been smoking marijuana for a year, but had never drunk anything other than beer before. He did know that they were drinking an alcoholic beverage that was clear like water. He further stated that he knew what he was doing when he smoked marijuana and could "come down."

Defendant testified in his own behalf, that on September 25, 1975, he was eating breakfast and watching television when Ruff, whom he had seen in the neighborhood, and his cousin entered his bedroom. Ruff took out some whiskey and rolled marijuana into cigarettes. Defendant stated that he had never drunk or smoked before but they "bugged him" into trying it. He later volunteered to go to the store with Ruff and somehow

wound up on LaSalle Street. He described what happened next as follows:

"Well, me and Ruff were walking, we got to talking about this incident that happened between me and my brother when I was younger and you know I got to thinking about it myself and I would flash back a little bit and all of a sudden I'd hear him call me, Hey Man, come on, and I'd just walk over and just sit down and close the door and at the time I was closing the door he would pull off and he said, if you hear anything shoot her, and he rushed something to me and I just grabbed it and —[Inaudible], with my head against the window trying to get myself together."

He did not notice what kind of car it was when they entered but later learned that it was a 1975 Lincoln Continental. He did not see anyone in the car at first, nor anyone attempt to get out. Ruff entered on the driver's side, he on the passenger's. The first time he saw the gun was when Ruff handed it to him. Neither he nor Rosemary Young said anything. He recalled being searched, handcuffed, and taken away by police.

During cross-examination, defendant testified that Ruff was just an acquaintance. Ruff knew his cousin better than he, although he was not his close friend either. Defendant knew that his cousin smoked marijuana and drank wine, but defendant had never participated before. He was not sure what type of liquor Ruff brought over, or what size the bottle was. It was a big bottle which they drank in its entirety. The other two began smoking and drinking before he did and he joined in after they called him names.

Defendant could not recall where he and Ruff went when they left the house. When Ruff handed him the gun he threw it on the floor of the car. When he realized what was happening he tried to "get himself together." He only fully regained his senses in the police station. He did not notice the police officer on the hood of the car.

STATE'S CASE IN REBUTTAL

Officer Fiore testified that he first observed defendant walking from the east to the west side of the street. His gait was normal and he did not have any difficulty entering the car. While he was pursuing the automobile, Fiore observed that defendant was sitting upright. When defendant hurriedly exited the automobile and ran into Fiore, the latter did not detect any alcohol on defendant's breath. Further, defendant was able to stand and step up into the patrol wagon. Fiore had been on the police force for 17 years and had observed intoxicated persons in both his work and social life. In his opinion, defendant was sober. During cross-examination, Fiore admitted that he had never seen anyone whom he

knew to be under the influence of marijuana. He agreed that walking across a public street with a gun in hand is unusual.

Officer McCarthy testified that defendant was seated upright, but slumped when he drew his weapon. McCarthy observed that just before defendant ran into Fiore, he had no difficulty running or getting out of the car. His ability to step into the police wagon was unimpaired, his answers at the police station were clear and concise, and his breath was normal. McCarthy, a police officer for 11 years had observed people who were intoxicated from liquor or marijuana in both his work and social life. In his opinion, defendant was sober and was not under the influence of marijuana.

During cross-examination, McCarthy stated that for several months he observed marijuana smokers in his capacity as an investigator of narcotics traffic for the U.S. Army. He noticed that it affected mental and spacial perceptions and depending on the volume of consumption, there were differences in the effects on motor skills.

OPINION

Defendant argues that his right to cross-examination was violated because of the court's failure to appoint an interpreter during the cross-examination of Rosemary Young. We do not agree.

■■ When necessary, the court will appoint an interpreter. (Ill. Rev. Stat. 1973, ch. 38, par. 165—11; ch. 51, par. 47.) The determination of whether or not one is necessary is generally within the discretion of the trial judge (*People v. Soldat* (1965), 32 Ill. 2d 478, 207 N.E.2d 449) who is in the best position to assess the witness' facility with the English language. An abuse of discretion may be shown where it appears from the record that the witness was not "understandable," "comprehensible" or "intelligible" such that the lack of an interpreter deprived defendant of a basic right. *People v. Ortiz* (1974), 22 Ill. App. 3d 788, 317 N.E.2d 763, *People v. Starling* (1974), 21 Ill. App. 3d 217, 315 N.E.2d 163.

■■ The record here does not establish the need for an interpreter. In reviewing the testimony of Rosemary Young, we fail to find support for defendant's contention that his basic right of cross-examination was violated. We find it unnecessary to quote the several excerpts from Young's testimony cited by defendant by way of example, because in each instance we note that Young eventually answered the question put to her, once it was repeated, rephrased or broken down into parts. (*People v. Ortiz* (1974), 22 Ill. App. 3d 788, 317 N.E.2d 763.) In addition it is evident from the trial judge's remarks that he found her testimony to be comprehensible and intelligible and even that the purpose of cross-examination was accomplished in that minor discrepancies in her

testimony were brought forth. Further, the judge afforded defense counsel the opportunity for additional cross.

Finally we note that this was not a situation where Young was the only occurrence witness, nor did defendant's conviction rest solely upon her testimony. (Compare *People v. Starling* (1974), 21 Ill. App. 3d 217, 315 N.E.2d 163.) Rather, the State produced two police officers to further prove their case. One officer witnessed the initial encounter between defendant and Young and never lost sight of the vehicle up to and through the apprehension of defendant and Ruff. The second officer was a key participant in the apprehension of defendant and Ruff, and even rode on the hood of the vehicle for a portion of the chase.

Defendant also argues that certain remarks made by the prosecutor in his closing argument reflected his personal belief in defendant's guilt and therefore deprived defendant of a fair trial. We disagree.

■■ "In determining whether a prosecuting attorney's argument to a jury is prejudicial, reference must be made to the context of the language, its relation to the evidence and the effect of the argument on the rights of the accused to a fair and impartial trial." (*People v. Smith* (1972), 6 Ill. App. 3d 259, 263, 285 N.E.2d 460, 463.) It is improper for a prosecutor to state his opinion of the guilt of the accused, to state facts not in evidence or to vouch his personal or professional reputation behind the credibility of his witnesses, for the making of such statements is tantamount to putting his own testimony before a jury. (*People v. Bitakis* (1972), 8 Ill. App. 3d 103, 289 N.E.2d 256.) However, a prosecutor may reflect unfavorably upon the accused if it is provoked by the remarks of defense counsel and it is not based upon his own personal opinion. (*People v. Anderson* (1971), 48 Ill. 2d 488, 272 N.E.2d 18.) Finally, a State's attorney may comment upon the credibility of the complaining witness during closing argument as long as he is not personally vouching for the witness. *People v. Oden* (1975), 26 Ill. App. 3d 613, 325 N.E.2d 446.

■■ We have reviewed the comments to which defendant objects and after considering them in the context of the entire argument, we find them to be proper. The remarks essentially fall into four categories. In a few of the comments the assistant State's attorney described the case in terms of a mystery novel. In the context of the argument, we find these comments to be a harmless metaphor. In another phase of the argument, the prosecutor stated, "I don't think that woman sat in that chair and lied to you." Although the prosecutor used the word "I," we do not believe that he was staking his personal or professional reputation behind her credibility. In light of the remainder of the argument, it is apparent that he was merely commenting on the difficulty of testifying in court for a person of a foreign background.

In another portion of the argument the prosecutor reflected on the believability of the intoxication defense. An objection to this line of argument was sustained and the State's attorney switched his tack and stated to the jury "You determine if one needs to be gullible to believe that defense, you determine that." Thus the prosecutor ultimately left the issue to the jury's determination.

■■ Finally we consider the following remark: "I do know, however, the two criminals were apprehended and I know a victim was rescued unharmed." We find that this statement was made to refute the defense's implication that Officer Fiore acted improperly in not deterring defendant and Ruff prior to their entering the automobile, since Fiore testified that he observed Ruff crossing the street with a gun in his hand. Although the word "criminal" was employed to describe defendant, we find that this was provoked by the remarks of the defense counsel and not based on the State's attorney's personal opinion. (*People v. Anderson* (1971), 48 Ill. 2d 488, 272 N.E.2d 18.) Thus we do not find that any of these remarks, either separately or cumulatively, were improper or so prejudicial as to deprive defendant of a fair trial, especially in light of the overwhelming proof of his guilt. *People v. Smith* (1972), 6 Ill. App. 3d 259, 285 N.E.2d 460.

For the foregoing reasons, we affirm.

Affirmed.

SULLIVAN, P. J., and MEJDA, J., concur.