THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* GILBERTO MOLINA, Defendant-Appellant.

First District (3rd Division)    No. 79-2295

Opinion filed March 11, 1981.

234

James J. Doherty, Public Defender, of Chicago (R. H. R. Silvertrust, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Kevin W. Horan, and Marcella J. Meyer, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE WHITE delivered the opinion of the court:

Gilberto Molina (hereinafter defendant) was convicted of attempt armed robbery (Ill. Rev. Stat. 1977, ch. 38, par. 8—4) and armed robbery (Ill. Rev. Stat. 1977, ch. 38, par. 18—2) following a bench trial and was sentenced to serve six years in the Illinois Department of Corrections. On appeal, the defendant contends that at trial (1) he was not proved guilty beyond a reasonable doubt, (2) he was denied his due process right to confront witnesses in that the trial judge failed to appoint a Spanish-speaking interpreter for him, and (3) he was also denied his right to confrontation because the Serbo-Croatian interpreter, used to translate the testimony of Sefki Emiui, the State's chief witness, was incompetent.

Emiui testified through the interpreter that on the afternoon of June 19, 1978, he and his friend, Bicari Kamber, visited a restaurant located at Milwaukee and North Avenue in Chicago. At the restaurant, Kamber approached the defendant, whom he had known for two to three years, and asked the defendant if he would drive him to the Oak Park residence of his girlfriend, Joanne, in exchange for a certain amount of money. The defendant agreed and the defendant, Emiui, and Kamber left the restaurant, accompanied by a young woman named Elaine Butler. Although Kamber asked the defendant to drive him to Oak Park, in fact,

Emiui drove his own car, with the defendant supplying all the necessary directions.

At the trial, the witnesses differed as to what transpired during the trip to Oak Park. Emiui testified that on the way to Joanne's house, they were followed by a car occupied by two men, and that at one point, the defendant told him to pull into a parking lot. Emiui turned into the lot as directed and was followed into the lot by the car he had observed earlier. Emiui stated that when he stopped the car, Kamber paid the defendant $5 which was the amount Kamber had promised him. Then the defendant demanded another $5 or a total of $10. When Kamber gave him this amount, the defendant asked for $20. Again Kamber complied, however, at this point, the defendant stated that he wanted $20 more and grabbed Kamber's wallet. A total of $40 was taken from Kamber. Emiui testified that at the time the defendant took the money, a man had exited the second car and was holding a gun.

The defendant grabbed the gun from the man, pointed it at Emiui's ribs, and demanded more money. The defendant then attempted to snatch Emiui's car keys from the car's ignition, but Emiui managed to grab the keys first, and jumped out of the car. Emiui ran out of the parking lot and down the street in search of the police. According to his testimony, Emiui did not see the defendant again until June 28, the date of the defendant's arrest. At that time Emiui and Kamber were again at the aforementioned Chicago restaurant when they observed the defendant entering a nearby bar. The two men hailed a police car and informed the police officers of the June 19 robbery and the defendant's whereabouts. The defendant was arrested inside the bar and taken to the police station.

At the time of trial Kamber had returned to Yugoslavia and was unavailable to testify. The State called two eyewitnesses who lived in the immediate vicinity of the incident. Icem White, a traffic manager for the Chicago Bead Works, testified that on June 19, 1978, at approximately 6:45 p.m., while looking out of his third-floor apartment window at 448 North Austin in Oak Park, he noticed two small cars enter the parking lot located directly east of his window across Austin. White identified the defendant as the driver of one car and described its other passengers as a girl and another gentleman. He referred to the driver of the second car as the "victim." White testified that the defendant and the victim got out of their cars and appeared to be having a conversation when he observed the victim hand money to the defendant. He noted that the defendant's companion had exited the other car and was standing near the defendant but behind the victim. The conversation began to get louder, and it appeared that an argument had started. White testified that at this point he observed the defendant go to his car and return carrying a gun which he waved at the victim. White stated that he immediately picked up the

phone and called the police. While on the phone, he observed the victim's friend run south down an alley as the defendant turned down his rear license plate, got into his car and drove off quickly, turning into an alleyway headed east. White testified that he later talked to the police and the victims in the parking lot. As he remembers, the victim did not speak clear English. White stated that he had never seen the victim, the victim's friend, or the defendant prior to this time.

The other eyewitness, Alvin Menold, testified that on the evening of June 19, 1978, while in his home at 5962 West Midway Park, he heard distressful shouting outside. He looked out of his first floor window and saw a man getting into a car occupied by two men and a woman. Menold then observed the car speed out of the north end of the parking lot and head east into an alleyway. Menold testified that, although it was daylight and viewing conditions were favorable, he could not positively identify the four persons in the car. However, he did say that the man he had observed entering the car was a young man with a dark complexion. Menold stated that after viewing this activity from his window, he went to the parking lot where he saw the police speaking with two men. According to Menold, the two men were very excited and spoke very little English. At the trial, Menold identified Emiui as one of the men whom he had seen in the parking lot on that day.

Chicago Police Officer Michael Gehardstein, called as a State's witness, testified that on June 19, 1978, he was on patrol when he received a call that there was a robbery victim on the street at 447 N. Austin. Gehardstein stated that when he arrived at the scene of the robbery, he interviewed Emiui and Kamber. He recalled that Emiui spoke broken English and that Kamber was unable to speak English. Emiui reported to Gehardstein that one female and three males had committed the robbery and that the offenders were of Latin or Mexican nationality. Emiui told the police officer that his friend, Kamber, had known one of the offenders for two or three years.

The defendant testified on his own behalf that it was his understanding that he was to be paid $10 for directing Kamber to Joanne's, $5 in advance, and $5 upon arriving at Joanne's, and since he did not receive any money from Kamber either before leaving the restaurant, or before reaching the parking lot, he requested the full $10 when they arrived at the Oak Park parking lot. It is his testimony that Kamber gave him the requested $10 but then took it back when Kamber and Emiui began to argue between themselves. The defendant testified that an argument also occurred between Elaine Butler and Emiui over $20 which Emiui had allegedly promised to pay to Butler in exchange for having sex with him.

Defendant stated that at this point he saw a black man exit another car in the parking lot and pull a gun, whereupon defendant decided to

"just get out" of the parking lot. He ran down a nearby alley and then walked to Chicago Avenue where he took the bus home. Defendant testified that he ran because he "didn't want to be part of this case."

The defendant's wife, Susie Molina, testified that she had been married to the defendant for 20 years. She stated that the defendant works to support his family and that the defendant has a good reputation in the community for truth and veracity. On cross-examination Mrs. Molina testified that she was unaware that her husband took money from men as payment for getting them women.

Andrea Molina testified that she was the daughter of the defendant, that she lives with her parents and four sisters and that her father is a good father.

The trial judge found the defendant guilty of armed robbery and attempt armed robbery. Following a denial of the defendant's post-trial motion, he was sentenced to serve six years in the Illinois Department of Corrections, and this appeal followed.

■■ The defendant first contends that he was not proved guilty beyond a reasonable doubt because the testimony of State's witnesses Emiui and White was inconsistent, incredible and unintelligible. In support of this assertion, defendant points out that the testimony of Emiui and that of White conflicted on such matters as where the various passengers sat in the two cars that pulled into the parking lot, the identity of the drivers of those cars, and the source from which the defendant secured the gun. Upon review of the record, we find Emiui's testimony consistent with the defendant's in stating that Emiui, Kamber, the defendant, and Elaine Butler rode in one car driven by Emiui. State's witness White, however, testified that the defendant drove into the lot in a car which was occupied by his friend, Kamber. We also note Emiui's testimony that when defendant's companion exited the other car in the parking lot defendant grabbed the gun from him while White stated that he observed the defendant obtain the gun from the rear of his car.

There are discrepancies between the testimony of witnesses Emiui and White, but we find that on all material points relating to the offenses their testimony was consistent. Both witnesses testified that the defendant took money from the victim after an argument. Both said defendant brandished a gun. Whether this gun was taken from the defendant's "companion" as stated by Emiui, or whether, as White testified, the gun was retrieved from the rear of the car, is immaterial.

■■ The State maintains that the testimony of Emiui with its positive identification of defendant as the person who with his companion took money from Kamber at gun point and who put the gun to the ribs of Emiui and demanded money, plus the corroboration by White, an impartial eyewitness, were more than enough to establish beyond a

reasonable doubt defendant's guilt of both robbery of Kamber and attempt robbery of Emiui. We agree. It is well established that a reviewing court may not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses and will not reverse a criminal conviction unless the evidence is so improbable as to raise a reasonable doubt of guilt. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513; *People v. Stringer* (1972), 52 Ill. 2d 564, 289 N.E.2d 631; *People v. Reed* (1980), 80 Ill. App. 3d 771, 400 N.E.2d 688; *People v. Moore* (1977), 50 Ill. App. 3d 952, 365 N.E.2d 1356; *People v. Bleimehl* (1972), 9 Ill. App. 3d 273, 292 N.E.2d 60.) A positive identification of the accused by a single credible witness is sufficient to sustain a conviction. *People v. Jones* (1975), 60 Ill. 2d 300, 325 N.E.2d 601; *People v. Stringer* (1972), 52 Ill. 2d 564, 569; *People v. Soldat* (1965), 32 Ill. 2d 478, 207 N.E.2d 449.

The testimony of one witness, therefore, will support the finding of the trial judge provided that he witnessed the crime under circumstances where he could clearly hear and see what transpired. (*People v. Yarbrough* (1977), 67 Ill. 2d 222, 367 N.E.2d 666; *People v. Stringer* (1972), 52 Ill. 2d 564, 569.) State's witness, Emiui, was in close proximity to the defendant during the robbery of Kamber and had a gun in his ribs during the robbery attempt. The defendant himself testified to being present at the scene. The State's evidence, when viewed as a whole, is not so unreasonable, improbable or unsatisfactory as to raise a reasonable doubt as to the defendant's guilt. We will not, therefore, upset the trial judge's findings. *People v. Donald* (1963), 29 Ill. 2d 283, 194 N.E.2d 227; *People v. Giovanetti* (1979), 70 Ill. App. 3d 275, 387 N.E.2d 1071.

■■ The defendant next contends that the trial court abused its discretion by failing to appoint a Spanish-speaking interpreter and that this deprived him of his constitutional rights of due process and of confrontation. The State maintains that the defendant has not properly preserved this issue and that it cannot be raised for the first time now on appeal. The defendant failed to request the assistance of an interpreter prior to trial. In addition, the defendant failed to raise the issue by objection during the course of trial or in his post-trial motion. This would ordinarily constitute a waiver of this issue on appeal. (*People v. Pickett* (1973), 54 Ill. 2d 280, 310 N.E.2d 856; *People v. Spaulding* (1979), 68 Ill. App. 3d 663, 386 N.E.2d 649; *People v. Lampson* (1972), 6 Ill. App. 3d 1099, 286 N.E.2d 358.) An exception to this rule exists, however, if the alleged error which would otherwise be subject to the waiver rule constitutes plain error under Supreme Court Rule 615(a). (Ill. Rev. Stat. 1977, ch. 110A, par. 615(a); *United States v. Indiviglio* (2d Cir. 1965), 352 F. 2d 276; *People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233; *People v. Niebes* (1979), 69

Ill. App. 3d 381, 387 N.E.2d 800.) Under that provision any errors "affecting substantial rights may be noticed on appeal although they were not brought to the attention of the trial court." Ill. Rev. Stat. 1977, ch. 110A, par. 615(a).

■■ Since this error of which defendant complains would, if it exists, be a substantial error, we have examined the record. In so doing we find no error in the trial judge's determination not to appoint a Spanish-speaking interpreter for the defendant. It is generally within the discretion of the trial judge to determine the need for an interpreter at trial (*People v. Soldat* (1965), 32 Ill. 2d 478, 207 N.E.2d 449; *People v. Bragg* (1979), 68 Ill. App. 3d 622, 386 N.E.2d 485), and an abuse of that discretion may be shown where it appears from the record that the witness was not understandable, comprehensible or intelligible, and that the absence of an interpreter deprived the defendant of some basic right. (*People v. Murphy* (1961), 21 Ill. 2d 149, 171 N.E.2d 618; *People v. Shok* (1957), 12 Ill. 2d 93, 145 N.E.2d 86; *People v. Starling* (1974), 21 Ill. App. 3d 217, 315 N.E.2d 163.) Defendant relies on *United States ex rel. Negron v. New York* (2d Cir. 1970), 434 F. 2d 386, as supporting his contention that the trial judge should have appointed an interpreter sua sponte to enable him to participate effectively in his own trial. The facts of that case, however, are vastly different from those presented for our consideration here. In *Negron* the defendant was a 23-year-old indigent with a sixth grade Puerto Rican education who neither spoke nor understood any English. His attorney spoke no Spanish; without the assistance of an interpreter, counsel and client were unable to communicate with one another. Consequently, Negron was unable to participate at any level in his own trial. The United States Court of Appeals noted that "to the defendant, most of the trial must have been a babble of voices," and reversed on the grounds that defendant was denied his rights to cross-examine, to consult with his attorney, and more fundamentally, to be present at his own trial.

The defendant in the instant case, however, had a much higher level of language efficiency. He had resided in the United States over 20 years, had worked as a cab driver, and lived with his wife and child who, by their testimony, appear to speak English clearly. Moreover, defense counsel expressed a willingness to proceed with trial without an interpreter for his client and in fact, participated in the entire proceeding without objection.

Before trial the judge did, in fact, make a thorough inquiry into the matter and after doing so was assured by both defendant and defense counsel that there was no communication problem as made apparent by the following dialogue:

"MR. WIACEK [Defense counsel]: I asked Mr. Molina do you understand English?

DEFENDANT MOLINA: Yes sir, I understand.

MR. WIACEK: Will you talk to the Judge? Can you testify for yourself?

DEFENDANT MOLINA: Yes sir, I can.

THE COURT: You don't need an interpreter?

DEFENDANT MOLINA: No."

On this record it cannot be said that the trial judge abused his discretion in not appointing an interpreter.

■■ The defendant's final contention is that the Serbo-Croatian interpreter appointed by the court to translate the testimony of the State's chief witness, Sefki Emiui, was incompetent. Defendant submits that because of this incompetency he was denied his sixth amendment right to confront witnesses and his right to due process. Initially, the State argues that the defendant cannot raise this issue on appeal because he failed to object to the use of the interpreter during the course of the trial. However, the point was raised by the defendant in his post-trial motion. This appears to be a sufficient basis for raising it now on appeal. *People v. Dimond* (1977), 54 Ill. App. 3d 1036, 370 N.E.2d 686; *People v. Lawson* (1977), 52 Ill. App. 3d 343, 367 N.E.2d 560; *People v. Miller* (1977), 46 Ill. App. 3d 882, 361 N.E.2d 373.

We therefore have reviewed the arguments of both parties and the record to determine whether the trial judge erred in proceeding with the assistance of the Serbian interpreter, Joseph Peter. We find that he did not.

Courts have applied the same test in situations where a trial judge has failed to appoint an interpreter, and where an interpreter has been appointed but is claimed to be incompetent. In both cases, abuse has been found where the witness' testimony was "incomprehensible," or "unintelligible," or where the witness displayed a "lack of comprehension" of the English language to the extent that he could not be understood. (*People v. Starling* (1974), 21 Ill. App. 3d 217, 222, 315 N.E.2d 163.) We do not believe that the facts of the instant case support a finding of such abuse.

Defendant cites portions of the Emiui testimony through the interpreter as being unintelligible. While certain of Mr. Emiui's answers were confusing and unresponsive, an analysis of the entire segment reveals that as a whole his testimony was sufficiently understandable. Moreover, we believe that the trial judge who had the opportunity to hear the witness' testimony, with its inflections, and observe his gestures and general demeanor, would have a better understanding of Mr. Emiui's testimony. Indeed, there is no indication in the record that the trial judge or either counsel had any major difficulty understanding Mr. Emiui. The record reveals that the trial judge gave defense counsel full opportunity to question the interpreter prior to trial. Defense counsel declined to do so

and stated that if he observed any problems with the interpreter during the course of the trial, he would then raise the necessary objections. Defense counsel apparently saw no need for objection to the competency of the interpreter for he raised none. We have found Mr. Emiui's testimony, when viewed in its entirety, to be sufficiently comprehensible, and we find no abuse of discretion by the trial judge in using the appointed interpreter. *People v. Soldat* (1965), 32 Ill. 2d 478, 482; *People v. Shok* (1957), 12 Ill. 2d 93, 145 N.E.2d 86.

For the reasons stated above, the judgment of the Circuit Court of Cook County is affirmed.

Affirmed.

RIZZI, P. J., and McNAMARA, J., concur.