2019 IL App (2d) 170692-U
No. 2-17-0692
Order filed November 26, 2019

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Stephenson County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 16-CM-199 |
| | ) | |
| ADNAN AL-SHWAILI, | ) ) | Honorable James M. Hauser, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Hudson and Bridges concurred in the judgment.

**ORDER**

¶ 1   *Held*: Defendant showed no plain error in the trial court's failure to provide him with an interpreter during his guilty-plea hearing, as the record established that he understood English well enough to understand his plea and its consequences.

¶ 2   Defendant, Adnan Al-Shwaili, pleaded guilty to criminal trespass to real property (720 ILCS 5/21-3(a)(2) (West 2016)) and was placed on one year of court supervision. Following the denial of his amended motion to withdraw his guilty plea, defendant timely appealed. The issue on appeal is whether defendant was denied his due process right to be present at his guilty-plea hearing, where the court failed to provide an interpreter. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      On March 8, 2016, defendant, whose native language was "Arabic Iraqian," was charged with criminal trespass to real property (id.), stemming from his entry, on March 4, 2016, into the Freeport Health Network (FHN) Family Counseling Center after having been served with a trespass notice barring him from all FHN properties.

¶ 5      On April 7, 2016, at defendant's first court appearance, the following took place:

> "THE COURT: [Defendant], you have a criminal trespass to land, which is a Class B misdemeanor.  Do you know what you wish to do with that?
>
> THE DEFENDANT: Okay.  Maybe I'm going to die.  Can I go to hospital?
>
> THE COURT: Can you what?
>
> THE DEFENDANT: Maybe I'm dying.  Can I go to hospital for my doctor?  No hospital?
>
> THE COURT: So you're on your doctor's ord—medication, correct?
>
> THE DEFENDANT:  Yeah.  Every week, every month, I go.  Like, why no go to hospital?  Why I trespass.
>
> THE COURT: Okay.
>
> THE CLERK: Maybe he wants to talk—
>
> THE COURT: You have—
>
> What?
>
> THE CLERK: He can maybe talk to the State.
>
> THE COURT: Yeah.  I—I'll let you talk to one of the gentlemen.  Okay?
>
> THE DEFENDANT: When?  Now?
>
> THE COURT: Yeah.

THE DEFENDANT: Okay."

¶ 6    When the matter resumed, the State informed the trial court that defendant had asked for a public defender.  The court asked defendant if he had a job.  Defendant responded, "No.  Social Security."  The court asked, "That's all you get?" and defendant responded, "Yeah."  When the court asked defendant how much social security he received, defendant responded, "800."  The court asked, "800 a month?" and defendant responded, "Yeah."  The court asked, "That's your sole source of income?"  Defendant again responded, "Yeah."  The court told defendant that it was appointing the public defender and that the matter would be continued so that defendant could appear with counsel.  The court told defendant that it was not setting the matter for trial, because it wanted defendant "to talk to [his] attorney before [he went] that route."  Defendant said, "Okay" and "I will."

¶ 7    At the next appearance, on May 18, 2016, defense counsel asked for a pretrial date.  The trial court set a date of June 22, 2016, and stated that the matter would be continued.  The following occurred:

"THE DEFENDANT: Why?  Why continue?  Why?

THE COURT: Because your attorney asked me to.

THE DEFENDANT: But my doctor—I go see my doctor.  Why you—

THE COURT: Good.

THE DEFENDANT: Why you continue?  (Unintelligible) where I go?  Hospital?  (Unintelligible) what I go home.  And then I (unintelligible) what I (unintelligible).

THE COURT: What's he talking about?

THE DEFENDANT: I go and see the doctor—

[DEFENSE COUNSEL]: Judge—

- 3 -

DEFENDANT: —and show you stuff. I show you. Please. The doctor send for you—

THE COURT: It's inappropriate for me to look at that, sir.

THE DEFENDANT: Okay.

THE COURT: [Defendant], would you like me to hold you in contempt of court?

THE DEFENDANT: I'm sorry, I'm sorry.

(End of proceedings.)"

¶ 8    The parties were next before the court on June 22, 2016, at which time defense counsel advised that defendant wished to waive his right to a jury trial and proceed with a bench trial. Thereafter, the following occurred:

"THE COURT: [Defendant], do you understand you're charged with the offense of criminal trespass to land?

THE DEFENDANT: Yeah.

THE COURT: Pardon me?

THE DEFENDANT: Yeah.

THE COURT: Do you understand that that charge is a class B misdemeanor that carries with it a potential sentence of up to six months in the county jail, a fine of up to $1500 and you could be placed on probation for up to two years?

THE DEFENDANT: Yeah.

THE COURT: Do you understand the nature of the charge pending against you.

THE DEFENDANT: (No verbal response heard.)

THE COURT: Do you understand the nature—

THE DEFENDANT: No, I don't speak English. I don't know—

- 4 -

THE COURT: Okay. Go have a seat. We'll call the case when I can get an interpreter on the phone."

¶ 9    When the matter resumed later that afternoon, an Arabic interpreter was present by telephone via "Language Line." The following occurred:

"THE COURT: [Defendant], your attorney indicated you would like to give up your right to a jury trial and have the matter set for a judge trial; is that what you want to do?

INTERPRETER: (Speaking in foreign language).

THE DEFENDANT: Yeah, bench trial. Okay.

THE COURT: Well, either speak English or Arabic, sir.

[Defendant], do you understand you're charged with criminal trespass to land?

INTERPRETER: (Speaking in foreign language).

THE DEFENDANT: Yeah. Yes.

THE COURT: That charge is a class B misdemeanor.

INTERPRETER: (Speaking in foreign language).

THE COURT: As such, you could be sentenced to the county jail for up to six months and fined up to $1500?

Do you understand that?

INTERPRETER: (Speaking in foreign language).

THE DEFENDANT: (No verbal response heard).

THE COURT: Do you understand that?

THE DEFENDANT: It's known I want a bench trial. I'm not guilty.

THE COURT: And I'm trying to place on the record certain admonitions that I have to give you before I can find a knowing and voluntary temporary [*sic*] waiver.

So answer my questions please, sir.

THE DEFENDANT: Okay.

THE COURT: Translate that, sir.

THE DEFENDANT: Okay. Because it's not like he—different accent. Everybody different accent. (Unintelligible), Palestine, Syria (unintelligible) all have different—all have Iraqian—I want to have Iraqian—

THE COURT: Sir, thank you for your time today. We'll get back to you.

Okay. I'm going to have you bring an interpreter in on another date.

THE DEFENDANT: (Unintelligible)

THE COURT: You find an interpreter that speaks English and the Iraqi dialect of Arabic.

THE DEFENDANT: Can I bring my friend?

THE COURT: Yeah, sure.

THE DEFENDANT: Okay.

THE COURT: You bring whoever you think is appropriate. Okay?

THE DEFENDANT: Thank you so much.

THE COURT: The person is going to be translating—

THE DEFENDANT: Okay.

THE COURT: —word for word. Okay?

THE DEFENDANT: Yeah. Thank you so much."

¶ 10    On July 20, 2016, defendant appeared with an Arabic interpreter. The interpreter was sworn in and he interpreted simultaneously with the proceedings. Through the interpreter, defendant indicated that he understood the charge, the potential penalties, and that he had the right to a jury trial. When the trial court asked defendant whether he wished to waive that right and proceed to a bench trial, the following occurred.

"[INTERPRETER]: Yes, sir.

THE COURT: And have the matter set for a bench trial?

[INTERPRETER]: Yes, the jury trial we talked about.

THE COURT: What?

[INTERPRETER]: He's saying jury trial. He don't want a bench trial.

[DEFENSE COUNSEL]: Okay. Judge, then we'll set this for a jury trial.

THE COURT: Madam Clerk, could I have a date for a jury trial for this young man?

[INTERPRETER]: He's saying he have two witnesses here.

THE COURT: Well, that's good. Does he want a jury trial or does he want a judge trial?

THE DEFENDANT: I got a witness. It's my doctor.

THE COURT: Ask him if he wants to have a judge trial or a jury trial?

[INTERPRETER]: He saying he wanted to but he want jury trial because he have two witnesses here.

[DEFENSE COUNSEL]: Judge, let's just set this on the jury trial call.

* * *

THE COURT: We will set the matter for a jury trial to Monday, September 19th.

[Interpreter]?

[INTERPRETER]: Yes, sir.

THE COURT: You are translating?

[INTERPRETER]: Yes.

THE COURT: So is the word Monday in English also Monday in Arabic?

[INTERPRETER]: No.

THE COURT: Well, then translate for me, will you.

[INTERPRETER]: He know—

THE COURT: Sir, we will set this matter for a jury trial to September 19th at 9:00 in the morning. We will have a jury pretrial on September 15th at 9 a.m.

* * *

THE COURT: [Defendant], here is a reminder slip that has your dates on it.

THE DEFENDANT: Thank you so much.

THE COURT: Please stay in touch with your attorney. I'll see you in September.

THE DEFENDANT: Okay. Thank you so much, [Y]our Honor."

¶ 11    The matter was thereafter continued several times. On January 4, 2017, defense counsel advised the court that he wished to present the court with a jury waiver and set the matter for a bench trial. Thereafter, the following occurred:

"THE COURT: [Defendant], do you understand that you are charged with the offense of criminal trespass to land which is a class B misdemeanor?

THE DEFENDANT: (No verbal response heard.)

THE COURT: It carries with it a potential sentence of up to six months in the county jail, a fine of up to $1500 and you could be placed on probation for up to two years. Do you understand that?

THE DEFENDANT: Yeah.

THE COURT: Do you understand the nature of the charge pending against you?

THE DEFENDANT: (No verbal response heard.)

THE COURT: You have the right to have a jury trial. A jury trial consists of 12 persons selected from the community that would hear the evidence and decide the question of your guilt or innocence by a unanimous verdict.

Is it correct that you would like to waive or give up your right to a jury trial and have the matter set for a bench trial whereby myself or another judge would decide the question of your guilt or innocence?

THE DEFENDANT: Bench trial.

THE COURT: Have I threatened you or promised you anything to get you to waive your right to a jury trial and have the matter set for a bench trial?

THE DEFENDANT: No.

THE COURT: No?

THE DEFENDANT: No, I would like that.

THE COURT: I will find a knowing and voluntary waiver of your jury trial rights."

¶ 12    When the parties appeared on March 9, 2017, for a bench trial, defense counsel advised the court that he wished to present the court with a fully negotiated plea agreement. Pursuant to the agreement, defendant would plead guilty to criminal trespass to land, in exchange for a sentence of one year of court supervision and the payment of various assessments. In addition he would be ordered to stay away from FHN properties, except for purposes of personal treatment. Defendant indicated that he heard the terms and wished to plead guilty.

¶ 13     Before accepting defendant's guilty plea, the trial court advised defendant of the nature of the charge and the sentencing range.  The court asked defendant if he understood, and defendant responded, "Yeah."  The court advised defendant of his rights to plead not guilty, to have a jury or bench trial, to cross-examine and confront witnesses, to call witnesses, and to testify.  He also advised defendant of the State's burden of proof.  The court asked defendant if he understood that, by pleading guilty, he would be giving up those rights.  Defendant responded, "Yeah."  The court also asked if anyone threatened him or promised him anything to get him to waive his rights.  Defendant responded, "Huh-uh."   The court advised defendant of the possible collateral consequences of pleading guilty, such as an increased sentence for any future conviction or an impact on his ability to obtain housing or employment.  When the court asked defendant, "[H]ow do you plead?," defendant responded, "Guilty."

¶ 14     The trial court next heard the factual basis of the plea, which established the following.  On March 4, 2016, at about 2:07 p.m., Corporal Zalaznik of the Freeport Police Department observed defendant, whom Zalaznik knew from prior contacts, on the second floor of the FHN Family Counseling building with Tabitha Goetz.  At about 3:12 p.m., Zalaznik met with FHN security officer Quincy Carter, who advised Zalaznik that defendant had been previously served with a trespass notice banning him from all FHN properties unless being seen as a patient.  Zalaznik confirmed that defendant was served with a trespass notice on January 28, 2016.  The trial court accepted the factual basis of the guilty plea.

¶ 15     After hearing the factual basis, the trial court told defendant that he had the right to make a statement and asked him if there was anything he wished to say.  Defendant responded, "No."  The trial court accepted the plea agreement and placed defendant on one year of court supervision.  The trial court also ordered defendant to pay various assessments.  The trial court also advised

defendant that, as a condition of the plea, he was required to stay off of all FHN properties expect for purposes of his own treatment. When asked if he understood, defendant stated, "Yeah." When asked whether he had "any questions about what happened here," defendant responded, "No."

¶ 16    On April 6, 2017, defendant filed a *pro se* motion to withdraw his guilty plea, stating as follows: "When I went to court I had been without my medication for days. I had not slept in two days. I was confused and meant to plead not guilty." On April 21, 2017, the trial court appointed the public defender to represent defendant on his motion.

¶ 17    On August 2, 2017, defense counsel filed an amended motion to withdraw defendant's guilty plea, arguing that "defendant did not knowingly, intelligently, and voluntarily waive his rights to jury trial, nor did the defendant fully understand or comprehend the admonishments of the Court pursuant to Supreme Court Rule 402 at the time of the entry of the plea of guilty."

¶ 18    A hearing on the amended motion took place on September 1, 2017. At the hearing, defendant testified that, at the time of the plea, he was not on his medicine. He stated:

> "I'm not on my medicine but I want to talk—my lawyer told the judge who did that I wouldn't be ready because I want my medicine and I don't know what I say. I not on medicine three days. I swear to God. I'm not on medicine. I don't know I say. And I find paper, I sign. I said what this paper? People don't tell me. He say you guilty. Guilty of what? I don't know. I try to help my girlfriend because she an alcoholic. I go with her to FHN and the police come and knock on the door and say—because the lady at FHN she say no she's after her. Please give her one day—"

Counsel interrupted defendant, stating that he did not want defendant to talk about the allegations. Thereafter, counsel presented the court with two letters from defendant's doctor, which according to counsel were evidence of "some mental health diagnoses." Defendant testified that he did not

understand what was happening when he pleaded guilty. He testified: "I don't know. I think I say guilty. I'm not guilty."

¶ 19 The trial court denied the motion, stating that it did not believe that the plea was entered under a misapprehension of the law or that defendant did not understand what was going on. The trial court stated: "He knew exactly what he was doing when he saw me on March 9." The court further stated that it did not believe that there was any doubt of defendant's guilt or that the ends of justice would be better served by submitting the case to a jury.

¶ 20 Defendant timely appealed.

¶ 21                                    II. ANALYSIS

¶ 22 Defendant argues that he was denied his due process right to be present at the guilty-plea proceedings, where the trial court was aware that he had limited proficiency in English but conducted the proceedings without an interpreter.

¶ 23 Defendant concedes that he forfeited the issue by failing to raise it below. See *People v. Sebby*, 2017 IL 119445, ¶ 48 ("To preserve a purported error for consideration by a reviewing court, a defendant must object to the error at trial and raise the error in a posttrial motion."). Nevertheless, he contends that we may reach the issue as plain error. See *People v. Escalante*, 256 Ill. App. 3d 239, 245 (1994) (reviewing for plain error the defendant's claim that the trial court's refusal to wait for appointed interpreter before beginning the State's examination of witnesses violated the defendant's right to be present at trial and confront witness); *People v. Molina*, 94 Ill. App. 3d 233, 239 (1981) (reviewing for plain error the defendant's claim that the trial court abused its discretion in failing to appoint an interpreter).

> "Plain error bypasses ordinary forfeiture principles, allowing a reviewing court to proceed
> on the merits of an unpreserved clear or obvious error when (1) the evidence is closely

balanced and the error threatened to tip the scales of justice against the defendant or (2) the error is so egregious that it challenges the fairness of the trial and the integrity of the judicial process." *People v. Camacho*, 2018 IL App (2d) 160350, ¶ 38.

Here, because defendant pleaded guilty, no evidence was presented. Thus, the question is whether the alleged error "affected the fundamental fairness of the proceeding and compromised the integrity of the judicial process." *People v. Cruz*, 372 Ill. App. 3d 556, 559 (2007). "We begin a plain-error analysis by determining if there was reversible error in the first instance, as '[a]bsent reversible error, there can be no plain error.' " *Camacho*, 2018 IL App (2d) 160350, ¶ 38 (quoting *People v. Cosby*, 231 Ill. 2d 262, 273 (2008)).

¶ 24    A criminal defendant has a fundamental right under the due process clause to be present at all critical stages of the proceedings against him. U.S. Const., amend. XIV, § 1; Ill. Const. 1970, art. I, § 8; *People v. Stroud*, 208 Ill. 2d 398, 404 (2004); *People v. Raczkowski*, 359 Ill. App. 3d 494, 497 (2005). "Without the aid of an interpreter, a defendant who speaks only a foreign language or with limited English proficiency, while having a physical presence in the courtroom, lacks a mental presence by his or her inability to understand or participate meaningfully in the proceedings." *People v. Argueta*, 2015 IL App (1st) 123393, ¶ 32.

¶ 25    Illinois law requires the trial court to "determine whether the accused is capable of understanding the English language and is capable of expressing himself in the English language so as to be understood directly by counsel, court or jury. If the court finds the accused incapable of so understanding or so expressing himself, the court shall appoint an interpreter for the accused whom he can understand and who can understand him." 725 ILCS 140/1 (West 2016). "The trial court must consider 'the factual question of whether an interpreter is needed; a trial court does not

have the discretion to deny an interpreter to a defendant who needs one.' " *Argueta*, 2015 IL App (1st) 123393, ¶ 34 (quoting *Raczkowski*, 359 Ill. App. 3d at 498).

¶ 26    In a guilty-plea case, the "critical issue" is whether the defendant "sufficiently understood the consequences of his plea." *Cruz*, 372 Ill. App. 3d at 560.  In *Cruz*, the defendant argued, for the first time on appeal, that his guilty plea was involuntary where the trial court failed to inquire into the interpreter's identity and qualifications and failed to place her under oath.  *Id.* at 558. According to the defendant, he did not understand the interpreter.  *Id.* at 561.  We found that the record established that the defendant sufficiently understood the consequences of his plea where he "never indicated that he did not understand the questions, nor did he ask to have any questions repeated, as would be a natural human response if difficulties with the interpreter prevented him from following the proceedings."  *Id.* at 560-61.  We further noted that the defendant's "failure to object sooner is a factor that weighs heavily against a claim of inadequate comprehension."  *Id.* at 561.

¶ 27    Here, it may have been premature for the trial court to have ordered an interpreter when it did.  However, the balance of the proceedings demonstrate that an interpreter was not necessary. The record makes clear that defendant sufficiently understood the consequences of his guilty plea. As in *Cruz*, defendant did not indicate at any point during the guilty-plea hearing that he did not understand the trial court's admonishments.  He did not ask to have anything repeated, and he responded appropriately after every admonishment.  Indeed, when the trial court specifically inquired as to whether defendant had any questions, defendant responded, "No."  There is nothing about the plea proceedings that indicates that defendant was not capable of understanding or communicating in English such that he needed an interpreter.  In addition, as in *Cruz*, defendant never argued below that the lack of an interpreter caused a misunderstanding of the plea

- 14 -

proceedings. Instead, he argued that he had not taken his medication and did not know what was happening when he pleaded guilty. This weighs heavily against his claim that he needed an interpreter to understand what was happening when he pleaded guilty.

¶ 28    Nevertheless, defendant points to instances in the record that occurred prior to the entry of his guilty plea, which he claims show that he needed an interpreter. To be sure, there were times when defendant seemed confused about the process. For instance, when defendant first appeared without counsel, he attempted to address the merits of the underlying offense. He asked, "Like, why no go to hospital? Why I trespass?" However, at that point, the trial court immediately terminated the proceedings and allowed defendant to speak with the State. When the parties were back on the record, the State advised the court that defendant wished to have the public defender appointed. Thereafter, defendant understood and appropriately answered all of the court's questions relating to his income and the appointment of the public defender. When the court told defendant that the matter would not yet be set for trial, because it wanted defendant to speak with his attorney first, defendant responded, "I will." There was absolutely nothing about this interaction that would lead the court to believe that defendant could not understand or communicate in English.

¶ 29    Defendant also points to his appearance on May 18, 2016, where his attorney asked for a continuance. Defendant maintains that, at this appearance, he "asked repeatedly to go to the hospital." We do not agree with defendant's interpretation of the record. Instead, the record shows that defendant questioned why the matter needed to be continued. When the trial court told defendant that it could not look at certain documents defendant had brought to court, defendant responded, "Okay." When it asked defendant if he wanted to be held in contempt, defendant

responded, "I'm sorry, I'm sorry." Again, we find no indication that defendant was not able to understand English.

¶ 30    The record also shows that, on June 22, 2016, the trial court readily arranged for an interpreter via "Language Line" when defendant responded to one of the court's questions by stating "No, I don't speak English." Notably, however, when the proceedings resumed with the interpreter, defendant continued to comment in English. Defendant also answered one of the court's questions before the interpreter translated it. When defendant complained that the interpreter had a "different accent," the court stopped the proceedings and granted defendant's request to bring a friend to interpret for him. When defendant next appeared with his interpreter, counsel advised that defendant wished to waive his right to a jury trial. Defendant responded through the interpreter that he wanted a "jury trial" and that he had "two witnesses here." In English, defendant stated, "I got a witness. It's my doctor." When the court provided a date for a jury trial, the court questioned the interpreter's use of the English word "Monday," telling the interpreter to "translate for me." The interpreter responded, "He know." When the court advised defendant of the dates and told him to keep in touch with his attorney, defendant, despite the presence of the interpreter, responded in English: "Thank you so much, [Y]our Honor."

¶ 31    We note that when defendant subsequently appeared on January 4, 2017, to waive his right to a bench trial, he did not bring or request an interpreter. It is reasonable to assume that, based on the availability of an interpreter at prior proceedings, defendant knew that one would be made available to him should he request one. And at no point during the proceedings did defendant express that he could not understand the trial court's admonishments. Finally, as noted, when he entered his guilty plea, defendant never expressed that he could not understand the trial court's admonishments or that he needed an interpreter. In fact, he responded appropriately to each of the

trial court's admonishments and never asked for clarification. It is clear that defendant fully comprehended the consequences of the fully negotiated plea agreement.

¶ 32    Given the totality of the record, we conclude that defendant was capable of understanding English and expressing himself in English, such that the absence of an interpreter during the guilty-plea proceedings did not result in defendant's absence for due process purposes. As we find no reversible error, there can be no plain error.

¶ 33                                III. CONCLUSION

¶ 34    For the reasons stated, we affirm the judgment of the circuit court of Stephenson County.

¶ 35    Affirmed.