The People of the State of Illinois, Plaintiff-Appellee, *v.* Willie Starling, Defendant-Appellant.

(No. 59156; ▮▮▮▮▮▮)

First District (2nd Division)—June 25, 1974.

James J. Doherty, Public Defender, of Chicago (Phillip A. Olson and John M. Kalnins, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Kenneth L. Gillis and Linda West Conley, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE DOWNING delivered the opinion of the court:

The defendant, Willie Starling, was charged, together with Martha Branch, a deaf-mute, with the armed robbery (Ill. Rev. Stat. 1971, ch. 38,

par. 18—2) of Sergio Bolanis. The indictment as against Martha Branch was dismissed during the course of defendant's trial. After a bench trial, defendant was found guilty of simple robbery (Ill. Rev. Stat. 1971, ch. 38, par. 18—1) and sentenced to a term of not less than 1 year nor more than 3 years.

Upon a review of the record, the pertinent facts, as adduced by the testimony in the trial court, can be summarized as follows. Sergio Bolanis, the complaining witness, spoke only Spanish, save for a few words in English. Prior to his testifying in the trial court, the court appointed an interpreter, Teresa Avila, to translate from English to Spanish and Spanish to English. Both counsel for defendant and the State told the court that they were satisfied to have Teresa Avila act as interpreter.

On direct examination, Sergio Bolanis testified, in pertinent part, that, at approximately 9 P.M. on July 4, 1972, he arrived at a tavern located at 1758 West 21st Place in Chicago; that, at the time, he carried about $500 on his person, all in $20 denominations; that after defendant, Martha Branch, and defendant's aunt, Queenola Starling, arrived at the tavern, he (Bolanis) offered to buy them a beer and that he used a $20 bill to pay for the beers; that Martha Branch asked him if he wanted to play a game of pool; that, after a time, he left the tavern and went outside with Martha Branch; that, while he was outside, defendant took out a gun and demanded money from him (Bolanis) and that Martha Branch then removed $480 in $20 bills from his shirt pocket; that, after he had been robbed, he threw a bottle at the windshield of defendant's car and broke the window; that he immediately reported the robbery to the police; and that he was later taken to a police station, where he saw defendant and Martha Branch. During his direct examination in the trial court, Sergio Bolanis identified defendant as the man who had had the gun and Martha Branch as the woman who had taken his money.

On cross-examination, Bolanis testified that Martha Branch, on the night in question, by making certain motions with her hands, had asked him to have sex with her. In response, he had motioned with his hands that they should go walking, as he did not have a car. Bolanis was shown a pair of pants allegedly worn by Martha Branch that evening. He was asked whether he had ripped those pants from Martha Branch, to which he responded that he had not done so.

Officer Stump of the Chicago Police Department testified on direct examination that, at approximately 12:15 A.M. on July 5, 1972, he and a partner, who were working out of uniform in an unmarked patrol car, learned through the police communications center that a robbery had been committed at 1758 West 21st Place and that the two possible offenders were heading toward 3014 West Polk Street in Chicago. One

individual, a male Negro, was described as wearing a gray and black shirt and a red hat, and as having a bandage on his hand; the other, a female Negro, was described as a deaf-mute, who was wearing a purple blouse. At about 1 A.M., after the officers had placed the Polk Street address under surveillance for 30 minutes, Martha Branch was observed in a gangway at the address and the defendant in an open doorway nearby; both individuals fit the descriptions given earlier by the police communications center. The officers placed defendant and Martha Branch under arrest and advised them of their rights. Defendant was searched, and $180 in United States currency was found on defendant's person. Officer Stump had inventoried the currency, and it was introduced into evidence in the court below.

Continuing, Officer Stump testified that he had been informed that the individuals might have been driving a brown auto with a broken windshield; and that, subsequent to the arrests, defendant's auto, which fit the description and had a broken windshield, was found in front of 3015 West Lexington Boulevard, across the alley from the Polk Street address where the arrests were effected.

On cross-examination, Stump testified that, after a search of defendant's person, apartment, and auto, no gun was recovered, and, further, that no money other than the above-mentioned $180 was recovered. He also testified that Martha Branch was not searched and that no money was discovered on her person. At the conclusion of Stump's testimony, the State rested its case.

Martha Branch was called as a defense witness, and her testimony was elicited with the assistance of a certified interpreter for the deaf.[1] She identified the pants which had been placed in evidence as those she was wearing on the night of her arrest. She testified that, on the evening in question, she was dancing at the tavern; that it was hot and she walked outside to cool off, but that she did not leave the tavern with Sergio Bolanis; that when she was outside, Bolanis grabbed her and pulled her pants, and that she hollered; that she had not taken any money from Bolanis that night and had not asked him to have sexual intercourse with her; that defendant never pulled a gun that night; and that she had not danced with Bolanis and did not play pool with him, and that he did not buy her any beer or liquor. On cross-examination, she testified that defendant supported her.

Defendant testified on direct examination that he lived at the Polk

---

[1] It is to be noted that Martha Branch had minimal language skills, according to the interpreter, and that she had conceptual limitations. The interpreter explained to the court that communication with her would be minimal, but that the interpreter could communicate with the witness.

Street address with his mother, grandmother, and, for a time, with Martha Branch; that, on July 4, 1972, he had arrived at the tavern on 21st place between 10:30 and 11 P.M.; that after he, Martha Branch, and his aunt, Queenola Starling, had taken seats and bought some beer, Sergio Bolanis came up to their table and had engaged in a conversation, in English, with his aunt; that, at approximately 12 or 12:30 A.M., the witness had left the tavern with "rent money," with which he was to pay his landlord the rent at the Polk Street address; that, earlier in the evening, before he had come to the tavern, his mother had given him $180 with which to pay the rent, pay other bills, buy some gasoline for his car, and use as spending money; that he had told his aunt he was going to leave the tavern to go home and pay the rent and that she had asked him to later return and pick her up; that, at this time, Martha Branch had "stepped out" of the tavern, and that he had walked outside, but didn't see her; that, after having returned to the tavern briefly, he left, entered his car to leave, and then heard a scream; that he knew it had to be Martha Branch screaming; that he exited his car and left it in the street; that he then came upon Sergio Bolanis and Martha Branch wrestling on the ground in an alley near the tavern; that Martha Branch's blouse and pants had been torn; that he picked up a stick and started screaming at Bolanis, and Bolanis ran into the tavern; and that he put Martha Branch in the car and drove her to the Polk Street address. Defendant further testified that he had not taken $180 from Bolanis, had not drawn a gun on Bolanis, and had not observed Martha Branch solicit Bolanis to have sexual intercourse for money on the night of the incident.

Defendant's mother, Mary Harris, was then called by the defense in an attempt to corroborate defendant's account of how he had come into the possession of the $180.

The defense then rested its case, and defendant was subsequently found guilty of plain robbery. This appeal followed.

The issues presented for review are: (i) was defendant proven guilty of robbery beyond a reasonable doubt, and (ii) questions relative to the appointment of an allegedly ineffective and incompetent interpreter.

## I.

On appeal, we find it necessary to consider only one of the assignments of error presented by defendant: whether defendant was denied his right to be confronted by the witnesses against him, owing to the court's appointment of an allegedly ineffective and incompetent interpreter for Sergio Bolanis. In sum, defendant urges that because the complaining witness spoke only Spanish, because the interpreter was incompetent, and because the translator frequently engaged in unrecorded discussions

with the complaining witness, defendant was deprived of his right to confrontation and cross-examination of the witness against him.

To put matters in perspective, we first reiterate that prior to allowing Bolanis' testimony, the trial court appointed an interpreter to translate from English to Spanish and Spanish to English; both counsel agreed that they were satisfied to have her as the interpreter in the case. The trial began, and, during the State's direct examination of Bolanis, defense counsel objected to a conversation being held between the witness and the interpreter; the objection was sustained. At other points during Bolanis' testimony, similar objections were made, and the court took pains to admonish the interpreter regarding the conversations.

At one point, even the assistant State's attorney commented about the difficulty of understanding what the witness was saying as related by the interpreter, and observed that the witness should testify in narrative. On the second trial day, defense counsel was accompanied to court by another interpreter, who, it is evident from the record, he planned to have act as interpreter, if the court would so allow. However, on that day, the complaining witness was unavailable, and the matter was again continued. When the trial was resumed (some 24 days later), the original interpreter was again sworn to her duty, and there is nothing in the record to indicate that defense counsel had brought along the other interpreter by whom he had been accompanied earlier. Subsequent to the trial's end, during argument over post-trial motions, defense counsel, while admitting that both the defendant and the State had agreed to the use of the appointed interpreter, urged that several times during the course of the trial he had objected to conversations between the interpreter and Bolanis and complained regarding the general ineffectiveness of the interpreter.

■■ When necessary, interpreters may be sworn truly to interpret (Ill. Rev. Stat. 1971, ch. 38, pars. 165—11 and 165—12 and ch. 51, par. 47), and the calling of an interpreter is normally within the discretion of the trial court (*People v. Soldat* (1965), 32 Ill.2d 478, 481, 207 N.E.2d 449; *People v. Shok* (1957), 12 Ill.2d 93, 95, 145 N.E.2d 86; *People v. Rivera* (1st Dist. 1973), 13 Ill.App.3d 264, 267, 300 N.E.2d 869). While these principles are clear, where there has been an abuse of that discretion vested in the trial court and a defendant is thereby deprived of a basic right—such as the right to confront the witnesses against him—we have the duty to review the question (*People v. Shok, supra*, at 95). Furthermore a conviction will be reversed where the abuse of that discretion deprives a defendant of some basic right. *People v. Murphy* (1961), 21 Ill.2d 149, 152, 171 N.E.2d 618.

While many of the significant cases involving interpreters have arisen

in situations where courts have failed to appoint interpreters for various reasons, and, thus, an abuse of discretion was claimed (*People v. Maurantonio* (1956), 8 Ill.2d 60, 132 N.E.2d 515; *People v. Soldat, supra; People v. Murphy, supra; People v. Shok, supra*), the central question in those cases, as we see it, was whether witnesses' testimony was "understandable" (*People v. Soldat, supra; People v. Murphy, supra*), or "incomprehensible" (*People v. Soldat, supra; People v. Maurantonio, supra*), or "unintelligible" (*People v. Soldat, supra*), or whether a witness displayed a "lack of comprehension" of the English language (*People v. Shok, supra*), to the extent that he could not be understood.

Here, we are presented with different circumstances, as the court below did, in fact, within his discretion, appoint an interpreter to translate for Bolanis, the complaining witness. Nonetheless, the central question still remains: was Bolanis' testimony, as presented through the interpreter, understandable, comprehensible, intelligible? And, if it was not, did that lack of intelligibility, brought about by an ineffective and incompetent interpreter, deny defendant the right to be confronted by the witnesses against him? We find, from a thorough review of the record, that defendant was denied that right.

Bolanis was the State's sole occurrence witness, and his testimony was wholly uncorroborated. Although counsel for defendant cross-examined Bolanis, the difficulties with which that procedure was fraught are abundantly apparent from the record. Defense counsel complained repeatedly of the interpreter's ineffectiveness, as did counsel for the State on at least one occasion. The trial judge was aware of the problems attendant on the matter before him and attempted to act accordingly. He admonished the interpreter regarding conversations with the witness; he attempted to clarify testimony of Bolanis (as did both counsel).

■■ It appears from the record that neither the trial judge, nor the attorneys or defendant understood Spanish. Thus, the accuracy of the questions and answers rested solely in the hands of the interpreter. It is obvious the interpreter was not fully, completely or accurately translating the questions and answers. When an interpreter is employed, that practice must be strictly followed; otherwise the possibility of editing, and error, rests solely with the interpreter. Due process rights of persons charged with crimes cannot be short-cut by avoiding the ritual of translating each question and answer as required in section 2 of the Act relating to interpreters (Ill. Rev. Stat. 1971, ch. 38, par. 165—12). In our view, the only cure for the unfortunate situation would have been another interpreter, one who would translate truly, competently, and effectively, each question and answer with due regard for his or her oath to do so.

■■ We realize that it must be shown that some injustice has been

done by the selection of an interpreter before we are justified in interfering with the trial judge's discretion in the selection of an interpreter (*American Brake Shoe & Foundry Co. v. Jankus* (1905), 121 Ill.App. 267, 271), but we find in this record an abuse of discretion in the selection made, which brought on an injustice: the denial of defendant's right to be confronted by the witnesses against him.

For these reasons, then, we reverse the judgment of the circuit court of Cook County and remand this matter to that court for a new trial to be conducted in a manner not inconsistent with this opinion.

Judgment reversed and remanded.

HAYES, P. J., and STAMOS, J., concur.