2020 IL App (1st) 180821

FIRST DISTRICT
THIRD DIVISION
November 12, 2020

No. 1-18-0821

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 5355 |
| | ) | |
| JOSE RESENDIZ, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Thomas J. Byrne, |
| | ) | Judge Presiding. |

JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Presiding Justice Howse and Justice Burke concurred in the judgment and opinion.

**OPINION**

¶ 1     Defendant Jose Resendiz appeals the first-stage dismissal of his *pro se* postconviction petition, arguing that the trial court erred in summarily dismissing his petition because he raised an arguable claim that the Spanish interpreter and his attorney failed to explain the nature of the guilty plea or admonish him of his right to file a motion to withdraw his guilty plea and file a notice of appeal.

¶ 2     Defendant was charged with multiple counts of predatory criminal sexual assault of a child, sexual assault, aggravated criminal sexual abuse of a victim under 13, and aggravated criminal sexual abuse of a family member based on the repeated sexual assault of his daughter A.R. when she was between the ages of 9 and 13. In a plea agreement, defendant pled guilty to two counts of predatory criminal sexual assault of a child in exchange for separate 10-year sentences for each count, to be served consecutively.

¶ 3    In September 2016, the parties appeared for trial with a Spanish interpreter present to interpret for defendant. The case was passed while defense counsel discussed a plea offer from the State. When the case was recalled, counsel indicated that defendant had rejected the plea offer and wanted to proceed to trial. The court inquired about the plea offer, and counsel stated that she had negotiated with the prosecutor for a total sentence of 22 years, which was under the mandatory minimum, and a dismissal of another pending case against defendant. The court asked defendant if he had discussed the offer, and defendant answered that he had and wanted a continuance. The court denied the request for a continuance because the case had been set for trial and the prosecution's witnesses were present. In regard to the sentence, defendant then told the trial court, "First she said it was 18 and if I wanted to take 15." The court clarified that "may have been [defendant's] understanding" and explained that his attorney can negotiate on his behalf but that the offer is from the State. The court stated that it "just want[ed] to make sure that you know what the offer is, and what the potential sentence is." When asked if he understood, defendant answered, "Yes." He also answered in the affirmative when asked if he talked to his lawyer about the offer from the State.

¶ 4    The trial court then admonished defendant that, if he was found guilty following trial, he was facing a minimum sentence of 24 years with a maximum sentence of 120 years, to be served at 85%. The court also explained that the second case with a second victim could result in a sentence of natural life in prison.

¶ 5    The trial court then discussed defendant's option for a bench trial and jury waiver. Defendant asked multiple questions, including asking if he could proceed with a jury trial. The court confirmed that defendant could have a jury trial. Defendant expressed concern with a jury trial and that "it's going to take more time to find the people, and I don't know how much time it

takes." The court told defendant not "to concern" himself with the time to find the jurors and that there were jurors available in the building. After the discussion, defendant stated that he would like a bench trial. Defendant identified his signature on a jury waiver. The parties then proceeded with opening statements.

¶ 6     The prosecutor gave the following opening statement.

> "Judge, you're going to hear testimony from [A.R.] in this case, she is the Defendant's daughter. By the time she let her family know what the defendant had been doing to her all—for most of her childhood, she was 15 years old. But this abuse that she went—underwent in the hands of this defendant started when she was in third grade. The defendant started by grooming her, hugging her in a way that made her uncomfortable, hugging her when she was actually laying down and the defendant, himself, was laying down.
>
> When she turned nine years old, she was in fourth grade, the defendant began touching her over her clothes and then his hands moved under her clothes. During the time that she was in 10th grade—strike that, when she was 10 years old when she was in fourth, fifth grade, she actually recalled a birthday party where the defendant actually called her out of her birthday party and touched her breasts, touched his penis to her anus, and later that same year, right after she turned 11 years old, he actually rubbed his penis on her vagina, put his mouth and his tongue to her vagina.
>
> This abuse went on, she had a 7th grade birthday party where she was also abused by the defendant late at night, drunk after the other party members—party persons—

***

The family had moved from the first floor of their residence into the basement, but this party had been going on outside, and the defendant found the victim alone in her bed. He pulled out her breasts, opened her legs and inserted his penis into her vagina. He had started putting his penis into her vagina when she was nine years old, and that abuse was ongoing, each of these incidents ended up with him placing his penis into her vagina.

He also started putting his penis into her anus as she got older starting at around 7th grade as well. He pulled out her breast and took her pants down, he usually put her clothes back on, but sometimes he would leave her naked as he actually went back into his own room

During one of these incidents, her sister was in the bed right around when she was 13 years old, and her sister remembers—her sister was 11 years old at the time, the victim was 13 years old. Her sister remembers the defendant coming in, she made sure she was awake and saw him come into the room, he then turned her head so that she couldn't see what happened next, but she could feel the bed shaking, and then she watched as the defendant left the room.

The victim eventually asked to go to therapy right around the time that she was entering into the 9th grade. Actually she placed the request as she was leaving 8th grade and going into 9th grade. She doesn't see someone until early in that school year and she starts going to therapy regularly.

During that time period, several months later until now, December of 2012, she actually outcries to her entire family after telling her grandma what happened.

4

The victim during this entire time period hadn't told anyone, but she was doing things to try to protect herself. And what she was doing would be that she would try to stay late at school, and she would try to get detention, she wouldn't turn her homework in on purpose so that she could stay late at school so that she wouldn't have to be alone with the defendant. Once the defendant realized that she was avoiding coming home, he would call her, and if she wouldn't answer her phone when she had a phone when she was a little older, he would call her sisters and make them go and give [A.R.] the phone so that he could tell her to come to the area which was the stairway in between the basement and the first floor where most of this the abuse was happening.

But the abuse was ongoing, the abuse included the defendant's contact with penis—his penis to her vagina, penis to anus during all of these time periods between the time she was—from the time that she was nine years old all the way until she was 15 years old.

And he also had contact with her in terms of his mouth to her vagina, his finger into her vagina, he touched her breasts and her vaginal area on the outside, all of this time period she is going to therapy and he is telling her things like your mother's going to be mad, don't tell anyone, and she believed that her mother would get mad if she told her. So she kept a secret until again she talked to her grandma and after she had been in counseling for several months.

And when she tells her grandmother, the grandmother tells the rest of the family. The mother is informed, ***, and when [her mother] gets home that day on

December 20, 2012 right around 10:00 p.m., she actually goes to confront the defendant.

Now, the defendant at this point is admitting that the allegations are true. And he is taken to the police station, but he's turned away. What happens in the meantime is that the victim is taken to Lurie's children's hospital, and the defendant eventually is told to move out of the house. He moves out of the house. This investigation is ongoing. Ultimately an investigative alert is issued for his arrest. Police are unable to locate him for quite some time. They get notice early on in the year of 2014, so almost a year and a half after the allegations come to light, that the defendant has been found in Texas. And once he's found in Texas, he's brought back to Illinois.

Once he arrives in Illinois, he makes admissions to all of this contact with the victim, indicates how old she is when he's having each type of contact, tries to minimize some of the contact, talking about inserting only the tip of his penis into her anus or only the tip of his penis to her vagina, admits to having vaginal intercourse with the victim 20 times or more, admits to inserting his penis into the victim's anus from the time she was 10 till the time she was 15 years old, from sixth to eleventh grade, admitting to touching her breasts and vagina about 20 times, and he does indicate that he went to Texas, that his in laws actually were the ones that advised him to go to Texas, perhaps because they were fully aware of all the allegations against him.

Judge, in addition, you will hear that the day that all these allegations came to light, the family earlier that day, the victim was with a cousin of hers, and that

she also heard the defendant over the phone that she recognized his voice, that she talked to him on the phone before, and that cousin Murtle (phonetic) heard the defendant trying to tell the victim not to tell anyone what happened because this is before the whole family knew. And Murtle will tell you how upset the victim was that day when the defendant was trying to tell her not to tell anyone, that she was crying, that she was extremely upset.

Judge, at the end of the State's case, we're going to be asking that you find the defendant guilty on all counts because these represent the ongoing assault and abuse of the victim, his daughter, over the course of those 10 years."

Defense counsel then gave the following opening statement, "Judge, you will hear evidence today, I believe you'll hear some inconsistencies that were made by [A.R.] as to what happened. I would be asking you to find my client not guilty at the end of the closing—at the end of this trial."

¶ 7 When the State started to call A.R. to testify, defense counsel asked for a moment, and a discussion occurred off the record. When the record resumed, the trial court stated that the parties had reached a plea agreement. The trial court then detailed the plea agreement and admonished defendant as to the terms. In exchange for defendant's guilty plea on two counts of predatory criminal sexual assault, he would receive a total sentence of 20 years. The remaining charges would be dismissed, and the second case would be nol-prossed. Defendant would have to register as a sex offender for the rest of his life. His sentence would be served at 85%, and he would have a period of mandatory supervised release. The prosecutor and defense counsel confirmed the agreement. The court then asked defendant if he understood, and defendant answered, "Yes." The following colloquy then occurred.

"THE COURT: Any questions about what the sentence would be if you pled guilty to those two counts?

DEFENDANT: She is telling me it's going to be 14 years.

THE COURT: I don't know what it works out—

DEFENDANT: With all the credit—

THE COURT: But it will be 20 years as the sentence to be served at 85 percent.

DEFENDANT: Minus the two and a half that I have here?

THE COURT: I would credit you with all the time that you've served."

¶ 8    The court further admonished defendant that, since he would be convicted of predatory criminal sexual assault, he would be evaluated to determine if he met the criteria for involuntary civil commitment under the Sexual Violent Persons Commitment Act (725 ILCS 207/1 *et seq.* (West 2016)). Defendant confirmed that he understood. The court again asked defendant if he had any questions about his sentence, and defendant responded, "No, that's all I wanted to know if you were going to give me credit and how much it will be reduced."

¶ 9    The trial court then proceeded with defendant's guilty plea. The court detailed the charges to which defendant was pleading guilty and the sentencing range. The court also admonished defendant that, if he was not a citizen, then he was subject to deportation. When asked if he understood each item, defendant answered, "Yes." The court asked defendant, "Knowing the nature of the charges and the possible penalties, do you still wish to plead guilty?" Defendant answered, "Yes." The court again explained defendant's right to a jury or bench trial, and when asked if he understood, defendant said, "Yes." The court also explained that, by pleading guilty, defendant was giving up the right to see and hear witnesses, ask witnesses questions, call his

witnesses, and testify in his defense. The court also stated that defendant was giving up his right to remain silent and have the State prove him guilty beyond a reasonable doubt. The court then asked defendant if he understood all the rights he was giving up, and defendant answered, "Yes." When asked by the court if anyone had threatened him or promised him anything to make him plead guilty, defendant answered, "No." The trial court asked defendant if he was "pleading guilty of his own free will," and defendant answered, "Yes."

¶ 10    The State then offered the following factual basis for defendant's guilty plea:

> "Judge if this were case were to go to trial, State's evidence would show that the victim in this matter, [A.R.] was between the ages of nine and 13 years old when the counts of predatory criminal sexual assault happened, and that during that time period and during the entirety of this case, she's actually the defendant's natural daughter; that the abuse happened at the location of 2322 North Melvina in Chicago, Cook County, Illinois, and that during the time period between the ages nine and 13 years old, the victim underwent abuse from this defendant, and this defendant would isolate her in their household, he would call her into areas of the household away from her sisters and at times when her mother was not present at the home, that he inserted his penis into her vagina on multiple occasions. During that time period, he also inserted his penis into her anus on multiple occasions during that time period; that the victim ultimately out cried, first to a friend and then to relatives.
>
> And then on the date of December 20, 2012, those relatives including her mother *** actually confronted this defendant about the allegations; that this defendant did make admissions at that time to relatives to [*sic*] within that home,

and he was told that he needed to leave the home; that the defendant then ultimately moved to Texas where he was actually found in March of 2014. He was brought back to Illinois, and after he was brought back to Illinois, he did give a full handwritten statement in which he admitted to the contact that he is pleading guilty to now, he admitted to inserting his penis into the victim's vagina. He admitted to inserting his penis into the victim's anus. And he admitted to doing both of those acts on multiple occasions during that time period when the victim was between nine and 13 years old."

¶ 11 The parties stipulated to the factual basis. The court then found that defendant's plea had been given knowingly and voluntarily and that a factual basis existed for the plea. The court accepted the plea and entered a finding of guilty.

¶ 12 Defense counsel stated that she explained what a presentence investigation report (PSI) was to defendant and that he indicated that he did not want to waive the PSI. The court then asked defendant if he understood what a PSI was, if he understood that it was up to defendant to have the report, and whether he spoke with his attorney about it. Defendant answered, "Yes, we just spoke about this." The court asked if counsel had explained defendant's right to waive the PSI and proceed to sentencing based on the plea agreement, and defendant answered, "Yes." The court asked defendant what he would like to do, and defendant responded, "Well, sign then." The court explained that it was asking if defendant wanted to give up his right to the written report, and defendant responded, "But why do I have to sign it to waive it, why?" The court again explained that it was defendant's right to the report. Defendant asked, "Do you want me to sign?" and indicated that he was asking his attorney. The court asked if defendant understood that he was entitled to the report, and defendant answered, "Yes." The court asked defendant if he understood

that he could proceed to sentencing and waive the report, and defendant responded, "I want to proceed with the sentence today." Defendant then confirmed that he was waiving his right to the written PSI.

¶ 13    The parties proceeded to sentencing. The State indicated the only aggravating factor was a prior misdemeanor retail theft. In mitigation, defense counsel noted that defendant had no prior felony convictions and had been working prior to his arrest. The court asked defendant if there was anything he wanted to say before the imposition of the sentence, and defendant responded, "No, that's all." The court then sentenced defendant as set forth in the plea agreement and imposed two consecutive terms of 10 years, to be served at 85%. The court asked defendant if he understood the sentence imposed, and defendant answered, "Yes."

¶ 14    The trial court then admonished defendant about his right to an appeal but that, before he could appeal, defendant would need to file a motion within 30 days asking to withdraw his guilty plea. The court further explained that, if it granted the motion, then the plea and sentence would be vacated, his case would be set for trial, and the dismissed counts would be reinstated. If the motion to withdraw his guilty plea was denied, then defendant would have 30 days from the denial to file a notice of appeal. The court also admonished defendant that he was entitled to a copy of the transcript of the proceedings and, if indigent, he could receive a copy free of charge with the assistance of his attorney. The court then asked defendant if he understood his appeal rights, and defendant answered, "Yes." The proceedings then concluded.

¶ 15    In December 2017, defendant filed his *pro se* postconviction petition. In his petition, defendant raised multiple claims, including that his guilty plea was involuntary in violation of his right to due process. Defendant asserted that he was "forced to take a plea bargain" due to "his lawyer refusing to do his or her job." He claimed that he did not understand English and "his

lawyer never had any \*\*\* court proceedings explained in Spanish. Nothing in Spanish was explained to him that he could withdraw his guilty plea and appeal his case." The petition stated that defendant was illiterate and that "the interpreter at the plea proceedings did not adequately explain what was being said" and that defendant "was unaware of the potential viable defense of entrapment and his counsel failed to present available mitigating evidence at his sentencing hearing. Defendant doesn't understand the English language!" Defendant further stated that the record does not reflect what the interpreter said to defendant and what defendant said to the interpreter. The court proceedings were conducted in English, and the trial judge and the prosecutor did not understand Spanish. Defendant also alleged that "a full translation of the proceedings was not provided, but rather only a synopses [*sic*] of what the translator deemed to be of interest to him." According to defendant, "nothing appears in the record to refute this claim."

¶ 16    Defendant attached affidavits in English and Spanish for this claim. He stated that he does not understand "English, writing, or reading, talking." He "declare[d]" himself "100% innocent."

> "During all court proceedings my lawyer or interpreter did not adequately explain what was being said. They did not adequately explain to me in Spanish what guilty plea was, did not explain I could file motion to withdraw plea bargain, or my right to appeal.
>
> If my lawyer an[d] interpreter would have explain [*sic*] the evidence against me and showed me all doctor reports, I would not have taken any plea bargain."

¶ 17    The petition further argued that his attorney "failed" to investigate and discover potential exculpatory evidence, failed to produce witnesses in mitigation, failed to communicate with defendant, and failed to file a motion to suppress and that defendant was prejudiced when his

counsel advised him to plead guilty "when evidence says he was innocent." The petition also raised various additional claims of ineffective assistance of counsel.

¶ 18   In March 2018, the trial judge, who also presided over the plea proceedings, entered a written order summarily dismissing defendant's postconviction petition as frivolous and patently without merit. In the order, the court found the record refuted defendant's contention that his guilty plea was involuntary because he does not understand English and did not understand the proceedings. The court specifically observed that "conspicuously absent from [defendant's] petition is the Spanish proficiency of his public defender, who, in fact, spoke fluent Spanish." The court recounted the lengthy discussion on the record regarding the guilty plea and the court's finding that that plea was knowing and voluntary.

¶ 19   This appeal follows.

¶ 20    The Post-Conviction Hearing Act (Post-Conviction Act) (725 ILCS 5/122-1 through 122-8 (West 2016)) provides a tool by which those under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both. 725 ILCS 5/122-1(a) (West 2016); *People v. Coleman*, 183 Ill. 2d 366, 378-79 (1998). Postconviction relief is limited to constitutional deprivations that occurred at the original trial. *Coleman*, 183 Ill. 2d at 380. "A proceeding brought under the [Post-Conviction Act] is not an appeal of a defendant's underlying judgment. Rather, it is a collateral attack on the judgment." *People v. Evans*, 186 Ill. 2d 83, 89 (1999). "The purpose of [a postconviction] proceeding is to allow inquiry into constitutional issues relating to the conviction or sentence that were not, and could not have been, determined on direct appeal." *People v. Barrow*, 195 Ill. 2d 506, 519 (2001). Thus, *res judicata* bars consideration of issues that

13

were raised and decided on direct appeal, and issues that could have been presented on direct appeal, but were not, are considered forfeited. *People v. Blair*, 215 Ill. 2d 427, 443-47 (2005).

¶ 21 At the first stage, the circuit court must independently review the postconviction petition within 90 days of its filing and determine whether "the petition is frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2016). A petition is frivolous or patently without merit only if it has no arguable basis in law or fact. *People v. Hodges*, 234 Ill. 2d 1, 16 (2009). A petition lacks an arguable basis in law or fact if it is "based on an indisputably meritless legal theory," such as one that is "completely contradicted by the record," or "a fanciful factual allegation," including "those which are fantastic or delusional." *Id.* at 16-17.

¶ 22 If the court determines that the petition is either frivolous or patently without merit, the court must dismiss the petition in a written order. 725 ILCS 5/122-2.1(a)(2) (West 2016). At the dismissal stage of a postconviction proceeding, the trial court is concerned merely with determining whether the petition's allegations sufficiently demonstrate a constitutional infirmity that would necessitate relief under the Act. *Coleman*, 183 Ill. 2d at 380. "At the pleading stage of postconviction proceedings, all well-pleaded allegations in the petition and supporting affidavits that are not positively rebutted by the trial record are to be taken as true." *People v. Robinson*, 2020 IL 123849, ¶ 45.

¶ 23 A petitioner " 'need only present a limited amount of detail' " in the petition and need not make legal arguments or cite to legal authority. *People v. Delton*, 227 Ill. 2d 247, 254 (2008) (quoting *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996)). "However a 'limited amount of detail' does not mean that a *pro se* petitioner is excused from providing any factual detail at all surrounding the alleged constitutional deprivation. Such a position would contravene the language of the Act that requires some factual documentation which supports the allegations to be attached

14

to the petition or the absence of such documentation to be explained." *Id.* (citing 725 ILCS 5/122-2 (West 2004)). The supreme court has "held that the purpose of section 122-2 is to establish that a petition's allegations are capable of 'objective or independent corroboration.' " *Id.* (quoting *People v. Hall*, 217 Ill. 2d 324, 333 (2005) (citing *People v. Collins*, 202 Ill. 2d 59, 67 (2002))). "[N]onfactual and nonspecific assertions which merely amount to conclusions are not sufficient to require a hearing under the [Post-Conviction] Act." *People v. West*, 187 Ill. 2d 418, 426 (1999).

> "Thus, while a *pro se* petition is not expected to set forth a complete and detailed factual recitation, it must set forth some facts which can be corroborated and are objective in nature or contain some explanation as to why those facts are absent. As a result, the failure to either attach the necessary ' "affidavits, records, or other evidence" or explain their absence is "fatal" to a post-conviction petition and by itself justifies the petition's summary dismissal.' " *Delton*, 227 Ill. 2d at 254-55 (quoting *Collins*, 202 Ill. 2d at 66 (citing *Coleman*, 183 Ill. 2d at 380)).

¶ 24 On appeal, defendant argues that his *pro se* postconviction petition raised an arguable claim that the interpreter and his trial counsel failed to explain to him in Spanish the nature of his guilty plea or admonish him of his right to file a motion to withdraw his guilty plea and file a notice of appeal. Defendant has not challenged the other claims presented in his petition on appeal and has therefore forfeited those claims. *People v. Munson*, 206 Ill. 2d 104, 113 (2002) (concluding that the petitioner abandoned several postconviction claims by failing to raise them on appeal).

¶ 25 Fundamental due process rights require a court to permit an interpreter to translate courtroom proceedings when a party does not fully understand English. *Figueroa v. Doherty*, 303 Ill. App. 3d 46, 50 (1999). " 'This is so because inherent in [the] nature of justice is the notion that those involved in litigation should understand and be understood.' " *Id.* (quoting 75 Am. Jur. 2d

*Trial* § 230 (1991)). When a defendant is not provided a complete translation of all proceedings, a defendant could be deprived of his or her right to a fair hearing. See *id.* at 52. Further, "[d]ue process requires that the court accept defendant's guilty plea only upon an affirmative showing that defendant entered his plea voluntarily and knowingly." *People v. Haywood*, 2016 IL App (1st) 133201, ¶ 36.

¶ 26    Because a guilty plea involves the waiver of several constitutional rights, due process requires that the record affirmatively reflect the plea was entered into knowingly and voluntarily. *People v. Jones*, 174 Ill. App. 3d 794, 797 (1988) (citing *Boykin v. Alabama*, 395 U.S. 238 (1969)). Under Illinois Supreme Court Rule 402, before the court accepts a guilty plea, it must admonish defendant and determine that he understands (1) the nature of the charge; (2) the minimum and maximum sentencing ranges; (3) that he has a right to plead not guilty, persist in that plea if it has already been made, or plead guilty; and (4) that, by pleading guilty, he waives the right to a jury trial and to confront witnesses against him. Ill. S. Ct. R. 402(a) (eff. July 1, 2012); *Haywood*, 2016 IL App (1st) 133201, ¶ 36. The rule requires that, before the court accepts a plea of guilty, it must determine that the plea was voluntary; state the plea agreement in open court; confirm the terms of the plea agreement by questioning the defendant; and determine whether any force, threats, or promises, separate from the plea agreement, were used to obtain the plea. Ill. S. Ct. R. 402(b) (eff. July 1, 2012).

¶ 27    Here, defendant does not contend that the trial court failed to comply with Rule 402. And apart from one reference in his reply brief, defendant does not assert that the trial court failed to admonish him of his right to withdraw his guilty plea and his appeal rights under Illinois Supreme Court Rule 604(d) (eff. July 1, 2017). Rather, defendant generally argues that his plea was involuntary because he did not understand English and the interpreter and his attorney failed to

explain "what was being said, in particular, that he could withdraw his guilty plea and appeal his case."

¶ 28    Defendant relies on two cases to support his argument, *People v. Starling*, 21 Ill. App. 3d 217 (1974), and *People v. Alfaro*, 227 Ill. App. 3d 281 (1992). In *Starling*, neither the trial judge nor the attorneys nor defendant understood Spanish. *Starling*, 21 Ill. App. 3d at 222. However, at the trial for armed robbery, the complaining witness spoke only Spanish, and the trial court, in its discretion, appointed an interpreter for his testimony. *Id.* at 218. During the witness's testimony, multiple defense objections were sustained when conversations were held between the interpreter and the witness. The court admonished the interpreter regarding the conversations. *Id.* at 221. The prosecutor also "commented about the difficulty of understanding what the witness was saying as related by the interpreter, and observed that the witness should testify in narrative." *Id.*

¶ 29    The appellate court found that the defendant had been denied his right to confront witnesses against him. *Id.* at 222. The court found that it was "obvious the interpreter was not fully, completely or accurately translating the questions and answers." *Id.* The *Starling* court found an abuse of discretion in the selection of the interpreter, "which brought on an injustice: the denial of defendant's right to be confronted by the witnesses against him." *Id.* at 223. "[T]he only cure for the unfortunate situation would have been another interpreter, one who would translate truly, competently, and effectively, each question and answer with due regard for his or her oath to do so." *Id.* at 222.

¶ 30    In *Alfaro*, the defendant pled guilty to unlawful possession of a controlled substance with intent to deliver and received a sentence of 18 years. The defendant appealed his sentence, but the appellate court affirmed. *Alfaro*, 227 Ill. App. 3d at 282. In his postconviction petition, which was prepared by his appellate counsel, the defendant asserted that his plea was involuntary and in

17

violation of his right to due process as well as effective assistance of trial counsel. Specifically, the "[d]efendant, an illiterate and national of Mexico, asserted, *inter alia,* that the interpreter used at the plea proceedings did not adequately explain what was being said, that he was unaware of the potentially viable defense of entrapment, and that counsel failed to present available mitigating evidence at the sentencing hearing." *Id.* at 282-83. Shortly thereafter, appellate counsel moved to withdraw because he was unable to communicate in Spanish. *Id.* at 283. The trial court summarily dismissed the defendant's postconviction petition and did not consider the motion to withdraw. *Id.*

¶ 31 On appeal, the reviewing court considered whether the defendant had presented the gist of a constitutional claim to warrant further consideration of his petition. The court observed that there was "no indication of record that the public defender representing defendant at the plea proceedings, the prosecuting attorney, the court reporter or the trial judge spoke or understood the Spanish language." *Id.* at 285. The *Alfaro* court concluded that the defendant's allegations were sufficient to proceed to the next stage in postconviction proceedings. "The record discloses only the presence of the translator. It does not reflect what she said to the defendant, and it does not reflect what defendant said to her. From all appearances, the proceedings were conducted entirely in the English language, including defendant's responses to the court's admonitions." *Id.* The defendant "alleges that a full translation of the proceedings was not provided, but rather only synopses of what the translator deemed to be of interest to him. Nothing appears in the record before us to refute this charge." *Id.*

¶ 32 We find the circumstances of the present case to be distinguishable from these decisions. *Starling* involved multiple improper conversations between the interpreter and the complaining witness in Spanish when no one else present understood Spanish, which violated the defendant's right to confront witnesses against him. No such situation occurred in defendant's guilty plea

proceedings, where the interpreter was present to translate for defendant. And contrary to the circumstances in *Starling*, it is uncontested that defense counsel spoke Spanish. In its finding, the *Starling* court observed that "the difficulties with which that procedure was fraught are abundantly apparent from the record." *Starling*, 21 Ill. App. 3d at 222. The record in this case establishes that defendant clearly engaged with the trial court through the interpreter and no such difficulties were "abundantly apparent." Notably, unlike the apparent difficulties in *Starling*, none of the participants, such as defense counsel or the trial court, objected to or admonished the interpreter.

¶ 33    As for *Alfaro*, we initially observe that defendant's allegations in his postconviction petition were taken nearly verbatim from both the facts and the reviewing court's analysis in *Alfaro*. Defendant used these portions of *Alfaro* as his claims of error, including his allegation that he was not provided a full transcript but "rather only a synopses of what the translator deemed to be of interest to him. Nothing appears in the record to refute this claim." Defendant offers no additional details regarding any translation of the proceedings he received.

¶ 34    As in *Starling*, the *Alfaro* court noted that neither defense counsel nor the prosecutor nor the trial judge spoke Spanish; this is not true for the present case. More significantly, the decision in *Alfaro* offered a very limited factual background and no discussion of the defendant's participation in the trial court proceedings in its analysis. The *Alfaro* court did not provide any details of the guilty plea proceedings beyond the presence of an interpreter to aid the defendant. Without a review of the level of the defendant's participation in the proceedings, we cannot fully compare the proceedings in that case with the circumstances here. In contrast, our review of the record before us warrants a different result in this case.

¶ 35    Turning to the instant case, we find that the record on appeal rebuts defendant's assertion that, during all court proceedings, his attorney and the interpreter "did not adequately explain what

19

was being said," including what a guilty plea was and that he could file a motion to withdraw his plea bargain and his right to appeal. The report of proceedings for the September 2016 hearing indicated that a Spanish interpreter was present. It is also uncontested that defendant's trial counsel spoke Spanish. We also observe that the record on appeal does not include transcripts from any other hearings before the trial court. Defendant, as the appellant, bears the burden of providing a sufficiently complete record to support his claims of error. *People v. Smith*, 406 Ill. App. 3d 879, 886 (2010); see also *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). Any doubt arising from the incompleteness of the record will be construed against defendant. *Smith*, 406 Ill. App. 3d at 886; *Foutch*, 99 Ill. 2d at 391-92. However, our review of the common-law record reflects that, whenever defendant was in court, a Spanish interpreter was present. Defendant has not claimed that the Spanish interpreter failed to accurately translate any other proceedings over a span of two years, including a hearing on a motion to suppress.

¶ 36 Throughout the proceedings from September 2016, defendant asked questions and discussed multiple topics with the trial court with the aid of the interpreter. As detailed above, the trial proceedings on the day of defendant's plea covered multiple topics, including a rejected plea offer, whether to proceed with a bench or jury trial, the guilty plea, and whether to waive his right to a PSI. If he did not understand the relevance of something, defendant asked a question. The record illustrates that defendant was actively involved in the proceedings and never expressed a lack of understanding the interpreter.

¶ 37 Specifically, at the start of the proceedings, the parties discussed a plea offer from the State, and the case was passed to allow defense counsel to review it with defendant. When the case was recalled, the trial court discussed the plea offer with the parties and then asked defendant if he had an opportunity to discuss the plea. Defendant responded that he had and asked for a continuance

to think about the offer. The court denied defendant's request because the case had been "set for trial for sometime [*sic*]" and the witnesses were present. The court then inquired if defendant understood the sentencing range if found guilty; defendant responded that his attorney had "said it was 18 and if I wanted to take 15." The court then explained to defendant that his attorney could not determine the sentencing offer in a plea because it was subject to the State's offer. The court then explained the sentencing range if he was found guilty at trial. Defendant never expressed any lack of understanding.

¶ 38    Next, the court proceeded to the trial and confirmed that defendant wanted to waive his right to a jury trial. Defendant then engaged in a lengthy discussion with the court about his right to a jury trial. Defendant did not simply sign a jury waiver; he asked if he could "switch it to a jury," and the court told him that he could do so. Defendant then wondered about the time it would take to "find the people," but the court told defendant not to be concerned about the time to find a jury. Again, we point out, the trial court told defendant that jurors were available that day. After this discussion, defendant stated that he would "go with the Judge." Defendant then stated that he signed the jury waiver. The bench trial then started with opening statements. As the State prepared to call its first witness, defense counsel asked for a moment. Then a discussion occurred off the record. When the proceedings continued on the record, the court indicated that the parties had reached a plea agreement.

¶ 39    When the trial court stated the terms of the agreement on the record, defendant answered that he understood the agreement, but he questioned the time he would serve in prison, stating "She is telling me it's going be 14 years." The court explained the 20-year term at 85%, and defendant asked, "Minus the two and a half that I have here?" The court confirmed that defendant would receive credit for time he has served. When the court asked if defendant had any questions

21

about the sentence, defendant stated, "No, that's all I wanted to know if you were going to give me credit and how much it will be reduced." The court then read the counts for which defendant was pleading guilty, and at the conclusion of each, defendant stated that he understood. When asked how he pled to each charge, defendant answered, "Guilty." When the court detailed the terms of the sentence, MSR, and the risk of deportation, defendant answered that he understood each of these admonitions. The court asked defendant if he still wanted to plead guilty after knowing the nature of the charges and possible penalties, and defendant stated, "Yes."

¶ 40     The trial court then detailed each of the rights defendant was waiving by pleading guilty, including his right to a jury trial; his right to a bench trial; and his rights to confront witnesses against him, ask witnesses questions, call his own witnesses, to testify and to remain silent, and to have the State prove him guilty beyond a reasonable doubt. Defendant answered, "Yes" that he understood each of these rights that he was waiving. When asked if anyone threatened him or promised him anything to make him plead guilty, defendant answered, "No." Following the factual basis, the court found defendant's plea was given knowingly and voluntarily. The trial court fully complied with all guilty plea admonitions under Rule 402.

¶ 41     Next, defense counsel stated that she had explained to defendant what a PSI was, and defendant indicated that he did not want to waive the report. The court then discussed the PSI and defendant's decision with defendant. When asked if he discussed it with his attorney, defendant said, "Yes, we just spoke about this." Defendant then indicated that he would "sign then." The court explained that it was asking if defendant wanted to give up the written report; defendant said, "But why do I have to sign it to waive it, why?" The court continued the discussion with defendant that it was his decision to proceed to sentencing and waive the report. Defendant stated, "I want to proceed with the sentence today." The court confirmed that defendant was waiving his right to a

PSI, and defendant stated, "Yes" and again said, "I want to proceed with the sentence." Defendant then signed the waiver, and he verbally agreed that he understood that he was waiving his right to a PSI.

¶ 42    The parties then proceeded to sentencing. After defense counsel made a statement in mitigation, the court asked defendant if there was anything he wanted to say before the sentence was imposed; defendant said, "No, that's all." The court then imposed the agreed sentence from the plea agreement. After the sentence was imposed, the trial court asked defendant if he understood the sentence, and defendant responded, "Yes." The court then detailed defendant's right to withdraw his guilty plea and appeal rights. The court concluded by asking defendant if he understood his appeal rights, and defendant answered, "Yes."

¶ 43    Throughout the trial court's admonishments, made through a Spanish interpreter and in the presence of defense counsel who spoke Spanish, defendant repeatedly acknowledged he understood the rights he was giving up by pleading guilty as well as the charges and the sentencing ranges for the offenses. At no time during the plea proceeding did defendant indicate that he did not understand what the court was asking him or what his interpreter was saying, let alone that he did not understand the proceedings, his rights, or the consequences of pleading guilty. When defendant needed additional explanation or to clarify something, such as how much time he would serve, defendant spoke up and discussed matters with the trial court. Thus, the record rebuts defendant's assertion that he did not enter the plea voluntarily and knowingly. Additionally, defendant did not ask any questions or concerns after the trial court admonished defendant about his appeal rights. Defendant never suggested that he did not understand those rights or what the interpreter said. When specifically asked if he understood, he answered in the affirmative. The record in this case demonstrates that defendant fully understood the lengthy proceedings and,

23

specifically, he knowingly and voluntarily pled guilty to two counts of predatory criminal sexual assault and was fully advised about his right to withdraw his plea and file an appeal. The record does not in any way show a lack of understanding by defendant. In fact, the record demonstrates the opposite; his claims are completely refuted by the record.

¶ 44    While defendant asserts that this court must accept his allegations as true unless contradicted by the record, defendant's allegations are not well pled. Significantly, defendant failed to provide any specific factual allegations as to what he did not understand during his guilty plea proceedings. Instead, he offers only vague and conclusory allegations, which are insufficient to warrant further proceedings. See *West*, 187 Ill. 2d at 426 ("nonfactual and nonspecific assertions which merely amount to conclusions" are insufficient under the Post-Conviction Hearing Act). Defendant has not set forth the requisite "limited amount of detail" to his factual allegations such that his claims were capable of corroboration and were objective in nature. See *Delton*, 227 Ill. 2d at 254-55. None of defendant's claims are capable of "objective or independent corroboration." See *id.* at 254. Moreover, as previously observed, defendant's conclusory allegations were copied from the *Alfaro* decision and, therefore, were not specific to his guilty plea proceedings. He generally alleged that the interpreter and his attorney failed to explain the nature of his guilty plea and his appeal rights but offered no details, such as what he was not told and what was lacking from the explanation. He has not alleged, nor could he, that the trial court failed to adhere to the required Illinois Supreme Court Rules. Though defendant claimed to have received only a synopsis of the proceedings, he has not provided this synopsis, nor has he explained what portions of the proceedings were absent. Rather, the transcript provided a full and complete record of the court proceedings, which demonstrated defendant's knowing and active participation. In his affidavit, defendant offered the general claim that his attorney and the interpreter "did not adequately explain

to [him] in Spanish what [a guilty] plea was, did not explain [he] could file motion to withdraw plea bargain or [his] right to appeal." These conclusory statements are insufficient to satisfy the factual requirements under the Act. Accordingly, defendant's failure to allege any specific and objective factual errors in his guilty plea proceedings is fatal to his petition.

¶ 45    Additionally, we point out that the use of an interpreter is subject to both statutory requirements as well as a code of ethics. Defendant has not suggested that any violation by the interpreter occurred here. The Criminal Proceeding Interpreter Act (Interpreter Act) provides:

> "Whenever any person accused of committing a felony or misdemeanor is to be tried in any court of this State, the court shall upon its own motion or that of defense or prosecution determine whether the accused is capable of understanding the English language and is capable of expressing himself in the English language so as to be understood directly by counsel, court or jury." 725 ILCS 140/1 (West 2016).

Section 2 of the Interpreter Act states that the trial court "court shall enter an order of its appointment of the interpreter who shall be sworn to truly interpret or translate all questions propounded or answers given as directed by the court." 725 ILCS 140/2 (West 2016).

¶ 46    Further , the Illinois Supreme Court has set forth a Code of Interpreter Ethics for interpreters working within the Illinois courts. Canon 1 provides: "Interpreters shall render a complete and accurate interpretation or sight translation, without altering, omitting, or adding anything to the meaning of what is stated or written, and without explanation." Ill. S. Ct. Code of Interpreter Ethics Canon 1, at 4 (eff. Oct. 4 (2014). The commentary offers further guidance on this topic.

"[I]nterpreters are obligated to apply their best skills and judgment to faithfully preserve the meaning of what is said in court, including the style or register of speech. Verbatim, 'word for word' or literal oral interpretations are not appropriate when they distort the meaning of what was said in the source language, but every spoken statement, even if it appears nonresponsive, obscene, rambling, or incoherent should be interpreted. This includes apparent misstatements." Ill. S. Ct. Code of Interpreter Ethics Canon 1, Commentary, at 4 (eff. Oct. 1, 2014).

¶ 47    Defendant's conclusory allegations, taken from the *Alfaro* decision, fail to assert any specific errors by the interpreter and his attorney. Court interpreters are obligated to accurately translate the proceedings in a courtroom. The record in this case clearly demonstrates the active and understanding participation by defendant in all the court proceedings. Defendant's *pro se* petition presented an indisputably meritless legal theory, which was "completely contradicted by the record." *Hodges*, 234 Ill. 2d at 16.

¶ 48    In this case, we have no reason to doubt that the record before us rebuts defendant's claims. Not only did the trial court give all required admonitions required under Illinois Supreme Court Rules, but two sworn officers of the court were present for all of the proceedings. First, defendant's attorney "is an officer of the court and is always under an obligation to be truthful to the court." *City of Chicago v. Higginbottom*, 219 Ill. App. 3d 602, 628 (1991). Defense counsel spoke Spanish, and defendant confirmed multiple times on the record having conferred with his attorney throughout the proceedings. Counsel never objected or informed the court that the admonitions were not translated correctly. Second, the interpreter is sworn to translate all proceedings accurately from English to Spanish and from Spanish to English. The record definitively rebuts defendant's postconviction claims. See 725 ILCS 140/2 (West 2016).

¶ 49    Based on these circumstances, defendant has failed to set forth the gist of a constitutional claim, and the trial court properly dismissed his *pro se* postconviction petition as frivolous and patently without merit. Accordingly, we affirm the decision of the circuit court of Cook County.

¶ 50    Affirmed.

---

**No. 1-18-0821**

---

| | |
|---|---|
| **Cite as:** | *People v. Resendiz*, 2020 IL App (1st) 180821 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 14-CR-5355; the Hon. Thomas J. Byrne, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and Lauren A. Bauser, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Hareena Meghani-Wakely, and Summer Moghamis, Assistant State's Attorneys, of counsel), for the People. |

---